**In re AIRPORT CAR RENTAL ANTITRUST LITIGATION.***

**MDL No. 338.**

United States District Court, N. D. California.

April 16, 1981.

* Texas Auto Services, Inc. v. Hertz Corp., et al. (W.D.Texas); Pacific Auto Rental Corp. v. Hertz Corp., et al. (D.Hawaii); Pacific Auto Rental Corp. v. State of Hawaii, et al. (D.Hawaii); Trans Rent-A-Car, Inc. v. Hertz Corp., et al. (N.D.Cal.); Dollar Rent A Car Systems, Inc. v. Hertz Corp. (N.D.Cal.); Budget Rent A Car Co. of Florida, et al. v. Hertz Corp., et al. (S.D.Fla.); Brynic, Inc., et al. v. Hertz Corp., et al. (S.D.Ohio); Budget Rent A Car of Washington-Oregon, Inc., et al. v. Hertz Corp., et al. (C.D.Cal.); Brooksbank v. Hertz Corp., et al. (D.Minn.); Budget Rent A Car of Reno v. Hertz Corp., et al. (C.D.Cal.); DRC Industries, Inc. v. Hertz Corp., et al. (S.D.N.Y.); (All of the above consolidated as MDL Docket No. 338).

F. Douglas Ruud, Alan D. Judy, Terry E. Thomson, Diamond & Sylvester, Seattle, Wash., Ralph Jonas, Michael D. Donahue, Richard N. Rust, Jonas, Donahue, Kinigstein & Hoffman, Los Angeles, Cal., for plaintiff Budget Rent-A-Car of Washington-Oregon, Inc.

James J. Walsh, Pillsbury, Madison & Sutro, San Francisco, Cal., Daniel R. Shulman, Michael P. Sullivan, Gray, Plant, Mooty, Mooty & Bennett, Minneapolis, Minn., Robert D. Raven, Morrison & Foerster, San Francisco, Cal., Jerome J. Shestack, Arthur H. Kahn, Ira P. Tiger, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for defendant The Hertz Corp.

## MEMORANDUM OPINION AND ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT

WILLIAM W SCHWARZER, District Judge.

### I. INTRODUCTION

With the advent of the modern jet liner, air transportation has become a form of mass transit. In 1979, some 317 million passengers were carried by commercial airlines in the United States.[1] As a consequence airports served by commercial airlines have become major transportation hubs providing a wide range of services to the travelling public. Among the most essential of these services are ground transportation to and from airports, such as bus, taxi and limousine service, and car rental agencies and automobile parking facilities. The authorities operating public airports are engaged in a variety of ways in arranging to have such services provided. In the case of car rental companies, they lease space to the companies to maintain service counters and other facilities at airports. Access to such space to provide on-airport service is of value to car rental companies who have therefore competed vigorously for the limited space which airport authorities make available for that purpose.

This litigation is an outgrowth of that competition among car rental companies. In actions commenced in several districts, a number of car rental companies complained in substance that The Hertz Corporation ("Hertz"), National Car Rental System, Inc. ("National") and Avis Rent a Car System ("Avis") engaged in joint activities to influence airport authorities to exclude competing companies from airports in violation of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2).[2] In the particular action

---

1. *The World Almanac and Book of Facts, 1981.* Figure represents number of revenue passengers enplaned.

2. These actions, and the districts in which they originated, are: *Texas Auto Services, Inc. v. Hertz Corp., et al.* (W.D.Texas); *Pacific Auto Rental Corp. v. Hertz Corp., et al.* (D.Hawaii); *Pacific Auto Rental Corp. v. State of Hawaii, et al.* (D. Hawaii); *Trans Rent-A-Car, Inc. v. Hertz Corp., et al.* (N.D.Cal.); *Dollar Rent A Car Systems, Inc. v. Hertz Corp.* (N.D.Cal.); *Budget Rent A Car Co. of Florida, et al. v. Hertz Corp., et al.* (S.D.Fla.); *Brynic, Inc., et al. v. Hertz Corp., et al.* (S.D.Ohio); *Budget Rent A Car of Washington-Oregon, Inc., et al. v. Hertz Corp., et al.* (C.D.Cal.); *Brooksbank v. Hertz Corp., et al.* (D.Minn.); *Budget Rent A Car of Reno v. Hertz Corp., et al.* (C.D.Cal.); *DRC Industries, Inc. v. Hertz Corp., et al.* (S.D.N.Y.). They have been consolidated and transferred to this Court as MDL Docket No. 338.

now before the Court on the motion of defendants Hertz and National for summary judgment, the plaintiff is Budget Rent A Car of Washington-Oregon, Inc. ("Budget"). Budget alleged that defendants engaged in a conspiracy to eliminate competition in the on-airport rental market and, in furtherance of that conspiracy, jointly influenced and engaged with airport authorities to adopt and enforce certain standards and requirements regarding eligibility to engage in on-airport car rental and the manner in which that business would have to be conducted. Budget alleged that those standards and requirements precluded it from competing in the on-airport car rental market at Portland and Eugene, Oregon and Seattle and Spokane, Washington.[3] Budget also alleged that defendants entered into contracts with airport authorities which prohibited other car rental operators from entering the on-airport market and established unreasonably high minimum guarantees, that they opposed applications of other car rental companies in bad faith, and that they fixed rental rates in the on-airport market.

Motions for summary judgment were previously filed by these defendants and denied while this litigation was assigned to a different judge of this court. *See In re Airport Car Rental Antitrust Litigation,* 474 F.Supp. 1072 (N.D.Cal.1979). The prior ruling held that defendants' joint actions to influence airport authorities were not exempt from the antitrust laws under the so-called *Noerr-Pennington* doctrine[4] because they were directed at commercial activities of those authorities. Following reassignment of these cases to this Court, defendants renewed their motions, albeit directed at a different plaintiff and with respect to different airports.

■ The Court is mindful of the institutional and policy considerations militating against reconsideration of an earlier ruling by a judge of the same court. As a rule, "the various judges who sit in the same court should not attempt to overrule the decisions of each other ...." *Castner v. First National Bank of Anchorage,* 278 F.2d 376, 397 (9th Cir. 1960) (citing *Shreve v. Cheesman,* 69 F. 785, 791 (8th Cir. 1895)). This rule is premised upon principles of comity and uniformity, and the need to preserve the orderly functioning of the judicial process. *Castner, supra,* 278 F.2d at 379–80. But it does not raise an absolute bar to reexamining questions previously de-

---

**3.** Among the standards and requirements alleged were the following:

(i) Not allowing more than a given number of on-airport automobile rental concessions at any given airport;

(ii) Allowing only persons engaged in the automobile rental market on the national level to operate on-airport automobile rental concessions;

(iii) Allowing only persons with national credit card systems to operate on-airport automobile rental concessions;

(iv) Allowing only persons with national reservation systems to operate on-airport automobile rental concessions;

(v) Allowing only persons with a given number of years of experience in the automobile rental market to operate on-airport automobile rental concessions;

(vi) Allowing persons with experience as an on-airport automobile rental concessionaire at a given number of airports to operate on-airport automobile rental concessions;

(vii) Allowing only persons which operate an automobile rental business which features a rent-it-here, leave-it-elsewhere program to operate on-airport automobile rental concessions.

(viii) Prohibiting the advertising and soliciting of automobile rental customers at the airport location by persons not having on-airport automobile rental concessions;

(ix) Prohibiting persons not having on-airport rental automobile rental concessions from picking up and delivering automobile rental customers to the airport;

(x) Placing persons other than Hertz, Avis and National who operated on-airport automobile rental concessions at competitive disadvantages by placing such persons' facilities such as counters, parking lots, ready spaces, holding spaces and car washes at undesirable locations at the airport, and by not allowing such persons to have some of the facilities at the airport location at all.

(xi) Prohibiting the advertisement of Budget's Sears Rent-A-Car program.

**4.** *Eastern Railroad Conference Presidents v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).

termined. It is well established in this circuit that one district judge in a multi-judge court may modify or overrule the interlocutory order of another judge sitting in the same case for "cogent reasons" or where "exceptional circumstances" are presented. *Greyhound Computer Corp. v. IBM*, 559 F.2d 488 (9th Cir. 1977), *cert. denied*, 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978); *United States v. Desert Gold Mining Co.*, 433 F.2d 713 (9th Cir. 1970); *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804 (9th Cir.), *cert. denied*, 375 U.S. 821, 84 S.Ct. 59, 11 L.Ed.2d 55 (1963); *Castner, supra*. An order denying a motion for summary judgment is generally treated as interlocutory and subject to reconsideration by the court at any time. *Preaseau v. Prudential Insurance Co.*, 591 F.2d 74, 79–80 (9th Cir. 1979); *Pearson v. Dennison*, 353 F.2d 24, 28 (9th Cir. 1965). It makes no difference whether the interlocutory order is reconsidered by the same judge or by a different judge to whom the case has been reassigned. *Desert Gold, supra*, 433 F.2d at 715.

Whether to reconsider a question previously decided has been left to the district judge's sound discretion. *Greyhound, supra; Castner, supra*. The Ninth Circuit explored the relevant considerations in this way:

> We are concerned here with a second judge to whom a case has been assigned after a motion ... for summary judgment [has] been denied by a prior judge and the case is set for trial. He is charged with the responsibility of conducting the trial to its conclusion. Yet after examination of the record he is firmly convinced that an error of law has been committed in denying the motions. He is faced with a dilemma: shall he defer here to the rule of comity and defer to the "erroneous" ruling of the first judge thereby allowing a useless trial to proceed, or shall he reverse the order of the prior judge and permit an immediate appeal, where he in turn may be reversed because he abused his discretion in overruling his colleague?

> Under such circumstances, we feel that there is no abuse of discretion in overruling the prior judge. The second judge must conscientiously carry out his judicial function in a case over which he is presiding. He is not doing this if he permits what he believes to be a prior erroneous ruling to control the case. He can settle questions presently without compelling the parties to proceed with what may be a futile and expensive trial. We think that these are cogent reasons and exceptional circumstances which justify a departure from the rule of comity within the permissible limits of judicial discretion.

*Castner, supra*, 278 F.2d at 380.

It is argued that the prior judge's ruling should not be disturbed because it constitutes the "law of the case." That phrase, as the Ninth Circuit has observed, "has been used to describe the multiple situations in which one court considers prior rulings of its own or other courts both on the trial and appellate levels." *Castner, supra*, 278 F.2d at 379 n.3. *See also* Annot., 20 A.L.R.Fed. 13 at § 3(b) (1974); 1B Moore's Federal Practice ¶ 0.404[4]. Whether it should apply in the absence of an intervening appellate court decision is not settled. *See Castner, supra*. But even if it were applicable, it would not bar reconsideration of the prior ruling:

> The law of the case is not entitled to the same respect as the doctrine of stare decisis. The law of the case does not demand obsequiousness right or wrong. Mr. Justice Holmes said that the phrase "law of the case" merely expressed the practice of courts generally to refuse to reopen what had been decided but was not a limit on their power. *Messenger v. Anderson*, 225 U.S. 436, 444, 32 S.Ct. 739, 740, 56 L.Ed. 1152 (1912). The only sensible thing for a trial court to do is to set itself right as soon as possible when convinced that the law of the case is erroneous. There is no need to await reversal. 1B Moore's Federal Practice ¶ 0.404[1], at 407. To modify the law of the case is primarily a matter of "good sense."

\* \* \* \* \* \*

There is no suggestion of forum shopping in this case. That would not be sanctioned, but even that would not require us to affirm error. We held in *Bowles v. Wilke*, 175 F.2d 35, 37 (7th Cir.), *cert. denied*, 338 U.S. 861, 70 S.Ct. 104, 94 L.Ed. 528 (1949), that "[t]he only restraint upon a second judge in passing upon an interlocutory issue decided by another judge in the same case is of comity only, which in no way infringes upon the power of the second judge to act.

*Champaign-Urbana News Agency, Inc. v. J. L. Cummins News Co.*, 632 F.2d 680, 683 (7th Cir. 1980).

■ The implication of First Amendment rights presents a cogent reason for reconsideration where, as here, substantial doubts are raised concerning the validity of plaintiff's claims. The pendency of a meritless suit can itself chill the exercise of those rights. *Franchise Realty Interstate Corp. v. San Francisco Local Joint Executive Board of Culinary Workers*, 542 F.2d 1076 (9th Cir. 1976), *cert. denied*, 430 U.S. 940, 97 S.Ct. 1571, 51 L.Ed.2d 787 (1977); *Federal Prescription Service, Inc. v. American Pharmaceutical Asso.*, 471 F.Supp. 126, 129 (D.D.C.1979). In addition, decisions by the Supreme Court subsequent to the prior ruling have helped clarify the permissible scope of regulation of commercial speech, *see, e. g., Central Hudson Gas & Electric Co. v. Public Service Cmssn.*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), and mandate reconsideration.

Finally, considerations bearing on economy in the administration of justice cannot be ignored. The decision on this motion may be largely dispositive, not only of the Budget action but of the other pending actions as well. This litigation confronts the parties with potential burdens of staggering dimensions. The conduct of defendants at more than 100 airports has so far

been placed in issue, and it is still an open question how many separate trials would be needed to adjudicate the claims against them. Accordingly, where a compelling showing has been made in support of a renewed motion for summary judgment, the motion should be entertained in the interest of justice albeit with appropriate deference to the prior ruling.

## II. DEFENDANTS' ALLEGED ACTIVITIES FALL LARGELY OUTSIDE THE SCOPE OF THE SHERMAN ACT

■ The initial inquiry must be whether, and to what extent the claims asserted are cognizable at all under the antitrust laws. Those laws "were enacted for the protection of *competition*, not *competitors*," *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (emphasis in original). Thus it is not enough for plaintiffs to show that somehow they were disadvantaged in their business activities. They must show that the conduct to which they attribute their loss fell within the proscriptions of the Sherman Act intended to "[prevent] ... restraints to free competition in business and commercial transactions which tended to restrict production, raise prices or otherwise control the market to the detriment of purchasers or consumers of goods and services ...." *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 493, 60 S.Ct. 982, 992, 84 L.Ed. 1311 (1940).

The combination or conspiracy complained of here is essentially among the defendant car rental companies.[5] But it is not asserted or shown that by their conspiratorial conduct they restricted or suppressed competition in the market for car rental services, or that they fixed prices,[6] divided markets, apportioned customers or restricted production. *Apex Hosiery Co. v. Leader, supra*, 310 U.S. at 469, 60 S.Ct. at

---

**5.** The peripheral charge that defendants also entered into conspiracies with airport officials is discussed in part III. E., *infra*.

**6.** Although plaintiff argues that the purpose and intent of defendants' exclusionary activi-

ties was to achieve a stabilization of prices in the on-airport car rental market, no evidence has been offered to show that defendants engaged in any joint activities to fix prices.

982. Taking plaintiff's claim at face value, the defendants conspired to influence the airport authorities to exclude plaintiff from access to the on-airport market. Access to that market is the relevant area of competition in this case, and plaintiff has offered no facts to show that it was barred from competing with defendants for contracts or leases with airport authorities, albeit under conditions not to its liking.[7] That the defendants may have acted jointly—even "collusively"—in dealing with airport authorities is irrelevant to the effects complained of by plaintiff, i. e., its alleged exclusion from the airports. If plaintiff suffered injury, it resulted from the acts of public officials declining to lease space to plaintiff, at least on terms acceptable to it, and not the joint action of defendants; that injury would have been the same had each defendant acted wholly independently in seeking to influence the authorities. Moreover, no complaint is made by airport authorities that *they* may have been deprived of the full benefits of competition among prospective lessees. On the contrary, plaintiff's complaint in effect is that defendants were seeking what amounted to exclusive leases and as an inducement offered competitive terms that were so favorable to the airports that plaintiff could not match them.

▮ Proper analysis of this case, therefore, requires one to escape the tyranny of labels which is so often destructive of sound reasoning, particularly in the antitrust field. One must put aside those phases of competition in the car rental field that are not involved here. There is no claim that defendants conspired with respect to the terms on which they rent cars to the public or otherwise limited or suppressed competition among them in the car rental market. Nor have any facts been offered indicating an agreement or conspiracy with airport authorities to exclude plaintiff from competing for leases or contracts with the airport.[8] The only agreement or conspiracy genuinely in issue here is one among these defendants to influence airport authorities to exclude plaintiff from the on-airport market and to grant defendants on-airport contracts or leases on terms which would have that effect.

Such an agreement imposes no restraint of trade. It may influence the airport authorities to restrict competition in the on-airport car rental market, but that restriction results from the decisions of the airport authorities as to the number of companies they allow to enter that market and the terms required of those companies, decisions which the airport authorities are necessarily authorized to make in the course of performing their function of managing the airports.[9] Any restraint therefore flows, not from the joint action of defendants, but from the airport authorities' exercise of their statutory authority and duty to manage the facilities in their charge.[10]

---

7. *Compare California Transport v. Trucking Unlimited*, 404 U.S. 508, 512, 92 S.Ct. 609, 612, 30 L.Ed.2d 642 (1972), in which the "allegations [were] not that the conspirators sought 'to influence public officials,' but that they sought to bar their competitors from meaningful access to adjudicatory tribunals and so to usurp that decisionmaking process." Plaintiff has offered no facts in support of a claim of denial of access to the airport authorities. *See* the discussion in part III. E., *infra*.

8. *See* note 5, *supra*, and part III. E., *infra*.

9. *See* part III. D., *infra*.

10. *See United Mine Workers v. Pennington*, *supra*, 381 U.S. at 671, 85 S.Ct. at 1594:
It is clear under *Noerr* that Phillips could not collect any damages under the Sherman Act for any injury which it suffered from the action of the Secretary of Labor. The conduct of the union and the operators did not violate the Act, the action taken to set a minimum wage for government purchases of coal was the act of a public official who is not claimed to be a co-conspirator[.]
The issue of statutory interpretation addressed in this section should not be confused with the issue of causation. *Compare In re Airport Car Rental*, *supra*, 474 F.Supp. at 1099, *et seq*. The Court assumes for purposes of this motion that defendants' joint activities could be found by a trier of fact to have influenced decisions of airport authorities. That conclusion is independent, however, of the question whether those joint activities can be found to be a restraint of trade prohibited by the Sherman Act.

■ A careful reading of *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., supra,* confirms that the Sherman Act does not reach the defendants' activities. The Court there interpreted the scope of the act in the following words:

We accept, as the starting point for our consideration of the case, the same basic construction of the Sherman Act adopted by the courts below—that no violation of the Act can be predicated upon mere attempts to influence the passage or enforcement of laws. It has been recognized, at least since the landmark decision of this Court in *Standard Oil Co. v. United States* [221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619], that the Sherman Act forbids only those trade restraints and monopolizations *that are created, or attempted, by the acts of "individuals or combinations of individuals or corporations."* Accordingly, it has been held that where a restraint upon trade or monopolization *is the result of valid governmental action, as opposed to private action,* no violation of the Act can be made out. These decisions rest upon the fact that under our form of government the question whether a law of that kind should pass, or if passed be enforced, is the responsibility of the appropriate legislative or executive branch of government so long as the law itself does not violate some provision of the Constitution.

We think it equally clear that the Sherman Act does not prohibit two or more persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly. Although such associations could perhaps, through a process of expansive construction, be brought within the general proscription of "combination[s] . . . in restraint of trade," *they bear very little if any resemblance to the combinations normally held violative of the Sherman Act, combinations ordinarily characterized by an express or implied agreement or understanding that the participants will jointly give up their trade freedom, or help one another to take away the trade freedom of others through the use of such devices as price-fixing agreements, boycotts, market-division agreements, and other similar arrangements.* This essential dissimilarity between an agreement jointly to seek legislation or law enforcement and the agreements traditionally condemned by § 1 of the Act, even if not itself conclusive on the question of the applicability of the Act, does constitute a warning against treating the defendants' conduct as though it amounted to a common-law trade restraint. And we do think that the question is conclusively settled, against the application of the Act, when this *factor of essential dissimilarity is considered along with the other difficulties* that would be presented by a holding that the Sherman Act forbids associations for the purpose of influencing the passage or enforcement of laws.

365 U.S. at 135–37, 81 S.Ct. at 528–29 (emphasis added). The quoted language, which perhaps has not received the attention it deserves, makes it clear that the *Noerr* decision rests on statutory interpretation, reinforced by First Amendment policies and considerations of federalism. To put it differently, *Noerr* holds that this kind of joint activity does not fall within the scope of the Sherman Act in the first place, not that it is removed from the act by an exemption. *See Cow Palace, Ltd. v. Associated Milk Producers, Inc.,* 390 F.Supp. 696, 701 (D.Colo.1975).[11]

11. If the Sherman Act does not reach agreements to influence the actions of others because they impose no restraint, it would be incorrect to treat such agreements as falling within an "exemption" or "immunity" provision subject to the presumption against repeal by implication. *See Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 399, 98 S.Ct. 1123, 1129, 55 L.Ed.2d 364 (1978), which, although referring to *Noerr* in the context of immunity, states that "a concerted effort by persons to influence lawmakers to enact legislation beneficial to themselves or detrimental to competitors *was not within the scope of the antitrust laws.*" (Emphasis added.) *See also*

The First Amendment has indeed been held to require the result reached in *Noerr*. In *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510–11, 92 S.Ct. 609, 611–12, 30 L.Ed.2d 642 (1972), the Court said that "it would be destructive of rights of association and of petition to hold that groups with common interests may not, without violating the antitrust laws, use the channels and procedures of state and federal agencies and courts . . . ." But the First Amendment analysis is not a prerequisite for determining that joint action which imposes no restraint is not within the scope of the Sherman Act.

This is confirmed by the decision in *Parmelee Transportation Co. v. Keeshin*, 292 F.2d 794 (7th Cir.), *cert. denied*, 368 U.S. 944, 82 S.Ct. 376, 7 L.Ed.2d 340 (1961), in which plaintiff charged that the defendants had violated the Sherman Act by conspiring to shift a contract to provide transfer services among railroad stations in Chicago to a competing transfer company. The complaint attacked not the contract but the collusive activities that led to its adoption. It was established that the railroads had been induced to enter the contract by a conspiracy whose members engaged in improper activities. No First Amendment issue was perceived by the court. After distinguishing *United States v. Yellow Cab Co.*, 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947), in which a group of companies had entered into agreements to control the operation and purchase of taxicabs in major cities, the court said, in words bearing on the instant case:

> On the other hand, the record in the case at bar shows quite the contrary. No interested bidder for the contract was prevented from competing for it. Competition, which was formally opened in November, 1954 by solicitation of bids and brought bids from plaintiff, Transfer and Willett, proceeded for more than six months. The competition between plaintiff and Transfer was always intense and finally became feverish. Both competitors made adjustments in their propositions in their eagerness to secure the contract with the railroads. The case made out by plaintiff's offers of proof and evidence reflects the unusual attention which high officials of the railroads bestowed upon the bidding. An assertion that the competitive market for this contract was destroyed or that the competition for it was eliminated is belied by the record. While one competitor succeeded and necessarily the other failed, unmistakably there was very strenuous competition. This unavoidable fact undermines the plaintiff's charges under §§ 1 and 2 of the Sherman Act. Nor is this result precluded by the fact (which a court might well find on the case presented by way of offers of proof) that the victory of the successful bidder was made easier by the wrongful conduct of a public official. Assuming the record presented as to his involvement reflects the truth (which we are for this purpose required to do), any party damaged thereby has (and would have had, even before the enactment of the Sherman Act) a ground for relief in the courts of this country. However, the use of conventional antitrust language in drafting a complaint will not extend the reach of the Sherman Act to wrongs not germane to that act, even though such wrongs be actionable under state law. We are not concerned with labels. Otherwise, an adroit antitrust lawyer might use his skill in the use of words to convert many unlawful acts into antitrust violations. The antitrust laws were never meant to be a panacea for all wrongs.

292 F.2d at 803–04. *See also Security Fire Door Co. v. County of Los Angeles*, 484 F.2d 1028 (9th Cir. 1973); *Sterling Nelson & Sons, Inc. v. Rangen, Inc.*, 235 F.Supp. 393 (D.Idaho 1964), *aff'd.*, 351 F.2d 851 (9th Cir.

---

the dissenting opinion of Justice Stewart, 435 U.S. at 427 n.1, 98 S.Ct. at 1144 n.1.

For that reason, it is also somewhat misleading to refer to a "*Noerr-Pennington* doctrine," since the question before the Court is not whether a doctrine or rule applies but whether particular activity is a restraint of trade. Subject to this cautionary note, the Court will nevertheless use the conventional terminology for the sake of brevity and convenience.

1965), *cert. denied*, 383 U.S. 936, 86 S.Ct. 1067, 15 L.Ed.2d 853 (1966); *Southern Airways, Inc. v. Atlanta*, 428 F.Supp. 1010 (N.D.Ga.1977).

The instant case attacks joint action to influence the decisions of others, not to impose a restraint upon trade such as a division of markets, an agreement on prices or other suppression of competition. That kind of action falls outside the scope of the Sherman Act.

## III. DEFENDANTS' ALLEGED ACTIVITIES ARE PROTECTED BY THE NOERR–PENNINGTON DOCTRINE

Although in the Court's view, the foregoing analysis substantially disposes of plaintiff's claims, in the interest of a complete disposition the other issues raised by plaintiff's contentions must be fully considered. In substance, it is plaintiff's argument that the *Noerr-Pennington* doctrine rests on First Amendment grounds, rather than statutory construction, and does not apply to activities intended to influence government officials engaged in commercial or proprietary functions, a view adopted in the prior ruling. *See In re Airport Car Rental, supra,* 474 F.Supp. at 1082–84, 1086 and 1090. The argument raises a series of issues:

A. Is there a commercial activity exception under *Noerr-Pennington*;

B. If the activities complained of retain a degree of First Amendment protection, are they subject to regulation by applying the Sherman Act;

C. Is the application of the Sherman Act to these activities supported by the decisions in *Parker v. Brown*, 317 U.S. 341 [63 S.Ct. 307, 87 L.Ed. 315] (1943), and in *Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389 [98 S.Ct. 1123, 55 L.Ed.2d 364] (1978);

D. If a commercial activity exception did exist, would it apply to the activities complained of here;

E. Are those activities in any event removed from protection under *Noerr-Pennington* by falling within the sham exception.

These issues are discussed in the following sections of this opinion.

A. *The so-called Commercial Activity Exception to the Noerr-Pennington Doctrine*

For purposes of this discussion, the Court assumes that the foundation for the so-called *Noerr-Pennington* doctrine rests on the First Amendment although, as heretofore observed, the First Amendment analysis appears to be superfluous to the determination that joint action which imposes no restraint does not fall within the Sherman Act.

The First Amendment analysis led the court in the prior ruling to apply a purported exception to the *Noerr-Pennington* doctrine for so-called commercial activity, i. e., joint action to influence government officials engaged in commercial or proprietary functions. The authority for such an "exception" was said to derive primarily from three decisions: *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.*, 424 F.2d 25 (1st Cir.), *cert. denied*, 400 U.S. 850, 91 S.Ct. 54, 27 L.Ed.2d 88 (1970); *Hecht v. Pro-Football, Inc.*, 444 F.2d 931 (D.C.Cir. 1971), *cert. denied*, 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972); and *Sacramento Coca-Cola Bottling Co. v. Chauffeurs Loc. 150*, 440 F.2d 1096 (9th Cir.), *cert. denied*, 404 U.S. 826, 92 S.Ct. 57, 30 L.Ed.2d 54 (1971).

In *Whitten* the parties were manufacturers of prefabricated "pipeless" pool gutters who sought to sell their products to public bodies acting under competitive bidding procedures mandated by state law. Plaintiff alleged that Paddock and its various dealers and representatives had violated Section 1 of the Sherman Act by conspiring to require the use of Paddock's own specifications in the public swimming pool industry with the intent to exclude others from bidding. Plaintiff also charged Paddock with making misrepresentations about Whitten and threats of litigation and harassment directed at Whitten and its customers. 424 F.2d at 27. Paddock moved for summary judgment, conceding for pur-

poses of the motion that it had combined with others to effect the adoption of its specifications in the industry, that its specifications were drawn so that only it could comply, and that its purpose was to eliminate competition. The trial court, citing *Noerr*, held that all efforts to induce governmental bodies to take action, regardless of their motives, were immune from antitrust liability. The court of appeals reversed. The opinion contains a lengthy discussion of *Noerr* and *Pennington* and concludes that

> immunity ... does not extend to efforts to sell products to public officials acting under competitive bidding statutes.

424 F.2d at 33.

For the following reasons *Whitten* is not authority for applying a commercial activity exception in this case:

First, the court's holding was limited to efforts to influence officials acting under competitive bidding statutes. By its terms, it does not apply to a case such as that before the Court in which the authority of the officials to restrict competition is uninhibited by the terms of the organic statutes.

Second, the case was decided prior to *California Motor Transport, supra*, in which the Court expressly acknowledged that the protection accorded joint advocacy was not limited to political or policy matters but extended to "business and economic interests." [12] *Whitten* fails to address the question why protection given to joint advocacy of private business and economic interests should be forfeited when public business and economic interests also become involved.

Third, the court based its decision on its understanding that "[t]he first amendment does not provide the same degree of protection to purely commercial activity that it does to attempts at political persuasion," citing *Valentine v. Chrestensen*, 316 U.S. 52,

62 S.Ct. 920, 86 L.Ed. 1262 (1942) and *Breard v. Alexandria*, 341 U.S. 622, 71 S.Ct. 920, 95 L.Ed. 1233 (1951). Six years after *Whitten*, however, the Court in effect refused to follow *Breard* and considered the continued validity of *Chrestensen* to have been questioned. *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 759–60, 96 S.Ct. 1817, 1824, 48 L.Ed.2d 346 (1976). Moreover, that "the First Amendment does not prevent government from adopting reasonable rules for regulating the conduct of those who seek its favor," as the *Whitten* court observed, 424 F.2d at 33–34, does not support the conclusion that the antitrust laws are an acceptable form of such regulation.[13]

In *Hecht, supra*, a group of businessmen who had unsuccessfully sought to obtain a football league franchise for the District of Columbia sued the Washington Redskins, the National Football League and the District of Columbia Armory Board for violations of Sections 1 and 2 of the Sherman Act. Plaintiffs alleged that a restrictive covenant in the lease between the Redskins and the Board prohibiting the use of Robert F. Kennedy Stadium by any professional football team other than the Redskins for a period of 30 years violated the prohibition against contracts in restraint of trade. 444 F.2d at 932. On cross motions for summary judgment, the trial court held that the leasing of the stadium pursuant to Congressional mandate was governmental action which, under *Noerr*, was exempt from the antitrust laws. The court of appeals reversed. In a wide-ranging opinion, it discussed various aspects of the antitrust laws including, with approval, the *Whitten* case. As for the applicability of *Hecht* to the instant case, however, it suffices to say that the issue there concerned not the lawfulness of joint action to influence public officials—no

---

**12.** The Court held:

> We conclude that it would be destructive of rights of association and of petition to hold that groups with common interests may not, without violating the antitrust laws, use the channels and procedures of state and federal agencies and courts to advocate their causes

and points of view respecting resolution of their business and economic interests *vis-a-vis* their competitors.

404 U.S. at 510–11, 92 S.Ct. at 611–12.

**13.** *See* discussion in part III. B., *infra*.

such action having been complained of—but the lawfulness of the stadium lease itself. The court's holding is summarized in the final paragraph of the opinion:

> On examination of the statute, the legislative history, the administrative practice, a comparison of the Stadium Act with other federal statutes referring or not referring to antitrust applicability, and the relevant cited cases, we do not find that the applicability of the federal antitrust laws has been excluded. We therefore hold that the validity of the thirty-year lease between the appellees Armory Board and Pro-Football, Inc., must be tested in accordance with the United States antitrust laws as usually applied to contracts between private parties.

444 F.2d at 947. The *Hecht* decision, therefore, has no direct bearing on the issues before this Court.

Finally, in *Sacramento Coca Cola, supra,* a soft drink bottler and vendor sued the Teamsters Union for antitrust violations by the alleged use of "threats, duress and other coercive measures" to induce California State Fair officials to forbid the sale of Coca-Cola on the fairgrounds. The district court had granted defendants' motion for judgment on the pleadings, relying on *Noerr* and *Pennington.* The court of appeals reversed on two grounds. First, it interpreted *Noerr* and *Pennington* as being limited to "political" activities, i. e., joint action "to attempt to influence the legislative or the executive with respect to the passage or enforcement of laws . . . ." 440 F.2d at 1098 and 1099. The later decision in *California Motor Transport, supra,* rejects that narrow reading and must be considered as superseding the court's interpretation. Second, the court regarded threats and coercion to fall outside the protection afforded by *Noerr* and *Pennington.* 440 F.2d at 1099. That view is consistent with general principles governing the exercise of First Amendment rights,[14] but has no bearing on the disposition of the instant case.[15]

For the reasons discussed, therefore, none of the three decisions can fairly be said to be authority for the existence of a generally applicable commercial activity exception to the *Noerr-Pennington* doctrine. Nevertheless, the breadth of the dicta in those opinions, and the weight attached to them in the prior ruling, make it appropriate to examine the possible bases for such an exception.

The Supreme Court has never recognized the existence of an exception for commercial activity under *Noerr-Pennington.*[16] In *Noerr,* it dealt only with activities to influence the legislative and executive department. It held that no violation of the Sherman Act can be predicated upon mere attempts to influence the passage or enforcement of laws, finding support for that hold-

---

14. *See, e. g., Giboney v. Empire Storage & Ice Co.,* 336 U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834 (1949), holding that "the constitutional freedom of speech and press" does not immunize speech or writing that is an integral part of illegal conduct.

15. *See also* discussion in part III. B., *infra.*

16. *Continental Ore Co. v. Union Carbide,* 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962), has been cited as suggesting that the Supreme Court may have recognized a limitation on *Noerr* in a commercial context. *See In re Airport Car Rental, supra,* 474 F.Supp. at 1079. But that decision does not address the permissible scope of joint activities to influence public officials. It held, in effect, that *Noerr* afforded no defense to a charge that defendants sought to eliminate plaintiff from the Canadian vanadium market where defendants had allegedly conspired to that end with a wholly-owned subsidiary corporation of one defendant which had been appointed by the Canadian government as its exclusive agent to purchase and allocate to Canadian firms vanadium during a period of wartime shortages. Distinguishing *Noerr,* the Court said:

> Respondents were engaged in private commercial activity no element of which involved seeking to procure the passage or enforcement of laws. To subject them to liability under the Sherman Act for eliminating a competitor from the Canadian market by exercise of the discretionary power conferred upon Electro Met of Canada by the Canadian Government would effectuate the purposes of the Sherman Act and would not remotely infringe upon any of the constitutionally protected freedoms spoken of in *Noerr.*

370 U.S. at 707–08, 82 S.Ct. at 1414–15.

ing not only in the language and purpose of the act but also in the need, first, to protect the power of government to take actions through its legislature and executive that restrain trade and, second, to protect the right to petition the government. 365 U.S. at 135–38, 81 S.Ct. at 528–30. While it acknowledged that application of the act to the facts in *Noerr* would result in regulation of "political activity," 365 U.S. at 137, 81 S.Ct. at 529, it also signaled its subsequent holdings when it said that a

> ... construction of the Sherman Act that would disqualify people from taking a public position on matters in which they are financially interested *would thus deprive the government of a valuable source of information* [.]

365 U.S. at 139, 81 S.Ct. at 530 (emphasis added).

When *Pennington* came before the Court, it disposed of the antitrust claim almost summarily in these words:

> Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act.

381 U.S. at 670, 85 S.Ct. at 1593. The Court implicitly rejected any distinction between political or policy-making actions and commercial activities, applying the stated principle both to the defendants' joint approach to the Secretary of Labor to obtain establishment of a minimum wage for employees of contractors selling to the TVA and to the approach to the TVA to curtail its spot market purchases from exempt contractors, all intended to drive small coal operators out of business. 381 U.S. at 660–61, 670, 85 S.Ct. at 1588, 1593.

Finally, in *California Motor Transport, supra,* the Court addressed the application of the Sherman Act to concerted action before regulatory agencies to resist and defeat applications by competing carriers seeking operating rights. In holding such activities to fall within the ambit of *Noerr* and *Pennington,* the Court did not advert to

any political or policy-making activities of the agencies involved. On the contrary, the opinion rests entirely on the rights of persons with common interests "to advocate their causes and points of view respecting resolution of their business and economic interests *vis-a-vis* their competitors." 404 U.S. at 511, 92 S.Ct. at 612. It is only when those activities transcend the limits of the First Amendment and, by reason of their "illegal or reprehensible" character, become a "sham" that they forfeit protection.

Not only is there no support for a commercial activity exception in the Court's opinions in the *Noerr-Pennington* line of cases, but such an exception is implicitly rejected in the Court's recent commercial speech decisions.[17] In *Virginia Pharmacy, supra,* the Court struck down a Virginia statute prohibiting licensed pharmacists from advertising prices of prescription drugs. Reasoning that the First Amendment protects not only the right to speak but the reciprocal right to receive communications, it held that compelling private and public interests precluded an exception for commercial speech:

> Advertising, however tasteless and excessive it sometimes may seem, is nonetheless dissemination of information as to who is producing and selling what product, for what reason, and at what price. So long as we preserve a predominantly free enterprise economy, the allocation of our resources in large measure will be made through numerous private economic decisions. It is a matter of public interest that those decisions, in the aggregate, be intelligent and well informed. To this end, the free flow of commercial information is indispensable. * * * And if it is indispensable to the proper allocation of resources in a free enterprise system, it is also indispensable to the formation of intelligent opinions as to how that system ought to be regulated or altered. Therefore, even if the First Amendment were thought to be primarily an instrument to enlighten public decisionmaking in a de-

---

17. *See* Note, The Supreme Court, 1979 Term, 94 Harv.L.Rev. 75, 159 (1980).

mocracy, we could not say that the free flow of information does not serve that goal.

425 U.S. at 765, 96 S.Ct. at 1827. *See also Bates v. State Bar of Arizona,* 433 U.S. 350, 363–64, 97 S.Ct. 2691, 2698–99, 53 L.Ed.2d 810 (1977); *Central Hudson, supra,* 447 U.S. at 561, 100 S.Ct. at 2349.

*Virginia Pharmacy* extends a measure of First Amendment protection to commercial speech. It does so for reasons highly germane to the instant case, namely, that the free flow of economic information is indispensable to informed decisionmaking respecting the allocation of resources in our free enterprise system. The goals of commercial speech and antitrust thus are congruent rather than in conflict. If, as the decision reasons, the free flow of commercial information to private decisionmakers serves an important public interest, the flow of that information to public decisionmakers presents the *a fortiori* case. It is therefore difficult indeed to see how *Virginia Pharmacy* leaves room for a commercial activity exception to *Noerr-Pennington.*[18]

Activities intended to influence public officials in making commercial decisions are entitled to protection not merely as proposals of a commercial transaction. Regardless of any collusion or purpose to gain a commercial advantage over competitors, they are a vehicle for communicating information to public officials. As the Supreme Court said in *Noerr,* it is people seeking official action to "bring about an advantage to themselves and a disadvantage to their competitors ... who provide much of the information upon which governments must act." 365 U.S. at 139, 81 S.Ct. at 530. Commercial speech therefore enjoys First Amendment protection not only as an exercise of the right to speak and petition but also to guard the reciprocal right of the public, through its officials and agencies at all levels of government, to receive infor-

mation. *Virginia Pharmacy, supra,* 425 U.S. at 757 and 765, 96 S.Ct. at 1823 and 1827; *Central Hudson, supra,* 447 U.S. at 563, 100 S.Ct. at 2350. *See also First National Bank of Boston v. Bellotti,* 435 U.S. 765, 783, 98 S.Ct. 1407, 1419, 55 L.Ed.2d 707 (1978); *Friedman v. Rogers,* 440 U.S. 1, 11 n. 10, 99 S.Ct. 887, 895 n.10, 59 L.Ed.2d 100 (1979); *Linmark Associates, Inc. v. Willingboro,* 431 U.S. 85, 92, 97 S.Ct. 1614, 1618, 52 L.Ed.2d 155 (1977).

### B. The Scope of Permissible Regulation of Commercial Speech

Having concluded that activities intended to influence government officials engaged in commercial or proprietary functions are entitled to the degree of First Amendment protection accorded commercial speech, one must next determine whether application of the Sherman Act to such activities qualifies as constitutionally permissible regulation.

To say that commercial speech is entitled to protection under the First Amendment is, of course, not to decide where the limits of that protection lie. "[D]ecisions dealing with more traditional First Amendment problems do not extend automatically to this as yet uncharted area." *Friedman v. Rogers, supra,* 440 U.S. at 11 n.9, 99 S.Ct. at 895 n.9. In its most recent opinion in this area, the Court stated that its decisions have recognized the distinction between "speech proposing a commercial transaction which occurs in an area traditionally subject to government regulation and other varieties of speech ...." While "commercial speech ... should not be withdrawn from protection merely because it proposed a mundane commercial transaction," *Bates v. State Bar of Arizona, supra,* 433 U.S. at 363–64, 97 S.Ct. at 2698–99, "[t]here is no reason for providing [the full panoply of First Amendment protections] when ... statements are made only in the context of commercial transactions." *Central Hudson,*

---

**18.** There would in any event be no rational basis for distinguishing between communications to private consumers and to government agencies acting in a commercial or proprietary capacity. *See George R. Whitten, Jr., Inc. v.*

*Paddock Pool Builders Inc., supra,* 424 F.2d at 34. The government being the nation's largest consumer, any communication directed at consumers generally will likely be of as much interest to public officials as to private persons.

*supra,* 447 U.S. at 562 n. 5, 100 S.Ct. at 2349 n.5.

In a series of recent decisions, the Supreme Court has begun to plant guideposts in this previously uncharted area. In *Ohralik v. Ohio State Bar Asso.,* 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978), it approved application of Ohio's disciplinary rule prohibiting the solicitation of clients to in-person solicitation of two young accident victims, one of whom at the time was confined in traction to a hospital room, the other having just returned home from the hospital. The Court considered the potential for overreaching established by the facts of that case sufficient to warrant enforcement of the rule over First Amendment-based objections. In *Friedman v. Rogers, supra,* the Court upheld a Texas statute prohibiting optometrists from practicing under tradenames, relying on experience in the state which showed that use of such names created a risk of deception. *See also Pittsburgh Press Co. v. Pittsburgh Comm. on Human Relations,* 413 U.S. 376, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973) (upholding enforcement against newspaper of antidiscrimination ordinance prohibiting the carrying of help wanted ads in sex-designated columns).

Those cases are distinguishable for the activities constituting the commercial speech in the instant case are not attacked as being false, likely to mislead or deceive, or related to unlawful activity. Attempts to influence public officials engaged in commercial functions do not fall into those rubrics; regardless of their anticompetitive purposes or effects, they are inherently lawful and cannot be analogized to the activities prohibited in *Ohralik* and *Friedman, supra.*

If the kind of commercial speech involved here is to be regulated, the regulation must meet the test articulated in *Central Hudson, supra,* in which the Court held:

> If the communication is neither misleading nor related to unlawful activity,

the government's power is more circumscribed. The State must assert a substantial interest to be achieved by restrictions on commercial speech. Moreover, the regulatory technique must be in proportion to that interest. The limitation on expression must be designed carefully to achieve the State's goal. Compliance with this requirement may be measured by two criteria. First, the restriction must directly advance the state interest involved; the regulation may not be sustained if it provides only ineffective or remote support for the government's purpose. Second, if the governmental interest could be served as well by a more limited restriction on commercial speech, the excessive restrictions cannot survive.

447 U.S. at 564, 100 S.Ct. at 2350.

The prior ruling in this case, issued a year before *Central Hudson,* reasoned that the governmental interest in preserving free competition was sufficiently strong to justify application of the Sherman Act to attempts to influence public officials in the exercise of commercial functions. It announced a balancing analysis in which a choice between First Amendment protection and antitrust liability is made on a case-by-case basis, depending on whether the agencies sought to be influenced were local rather than state or federal legislatures, and were making commercial rather than policy decisions. *In re Airport Car Rental, supra,* 474 F.Supp. at 1085–87.

■ *Central Hudson* now forecloses that approach. Under that decision, commercial speech, while subject to restriction, does not forfeit all First Amendment protection. Any restriction of such speech, to be valid, must directly advance a substantial interest and must not be broader than necessary to achieve that objective.

■ The Sherman Act does not meet that test. It is not a regulation or restriction of protected activity narrowly tailored to serve a particular interest.[19] Instead it is

---

19. An example of valid regulation of activity protected by the First Amendment is *United States v. Harriss,* 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 (1954), upholding the Federal Regulation of Lobbying Act. In that case, the defendants were charged with violations of the act

a means of subjecting activities to *post hoc* review by a jury and imposing penal damages if the activities are found to have violated the act. Its application would inevitably chill conduct within the ambit of the First Amendment. *Franchise Realty, supra,* 542 F.2d at 1082; *Subscription Television v. Southern California Theatre Owners Asso.,* 576 F.2d 230, 233 (9th Cir. 1978).[20] Subjecting commercial speech to "regulation" under the antitrust laws is therefore incompatible with the First Amendment. *See California Motor Transport, supra,* 404 U.S. at 510–11, 92 S.Ct. at 611–12.

### C. The Impact of Parker v. Brown and its Progeny

The prior ruling, finding a commercial activity exception under the *Noerr-Pennington* doctrine, rested in part on a perceived relationship to the principle of *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), as applied recently in *Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978). In the latter case, the Court held that municipalities may be subject to antitrust liability for anticompetitive activities. Because such activities are often commercial, the ruling reasoned, anomalous and inequitable results would likely follow if

private attempts to induce them were immune under the Sherman Act. Fearing that private persons instigating anticompetitive commercial activity by municipalities might otherwise escape liability while the municipality itself could be held liable for engaging in it, the court concluded that the *Noerr-Pennington* doctrine, although "rooted in very separate principles," should be interpreted as being essentially coextensive with *Parker v. Brown,* i. e., applicable only to attempts to influence government action itself not subject to the antitrust laws. *In re Airport Car Rental, supra,* 474 F.Supp. at 1089–90.

Whatever appeal such a symmetrical interpretation might have, it is, as discussed above, incompatible with First Amendment protection extended to activities constituting commercial speech. Moreover, the symmetry is more apparent than real. Contrary to the implication of the prior ruling, municipal antitrust liability does not turn on the distinction between commercial/proprietary and governmental activities on which the ruling sought to make application of *Noerr-Pennington* turn. If the opinions in *Lafayette* make anything clear, it is that this distinction was unacceptable to eight of the nine members of the Court.[21] A majori-

---

requiring the filing by solicitors and recipients of quarterly reports disclosing the receipt of contributions and the expenditure of moneys for the purpose of influencing legislation. The Court held that the act served a valid governmental interest, i. e., informing Congress who is being hired and who is providing funds, and how much, to influence legislation, and that the narrow construction given the act, requiring disclosure only by solicitors or recipients of such contributions, was a valid regulation of the exercise of First Amendment rights.

Undoubtedly, a state seeking to protect similar interests could, consistent with the First Amendment, impose registration and reporting requirements on persons seeking to influence the actions of public officials such as airport managers. But that is a far cry from federal courts applying the antitrust laws to the exercise of First Amendment rights, not only inhibiting the speaker but also interfering with the state's own interest in the free flow of commercial information to its public officials. This case would be the first to approve a curtailment of speech the effect of which would be

to impair rather than to serve a legitimate governmental interest of a state.

**20.** Although the Court has in the past indicated that the justification for applying the traditional overbreadth doctrine to commercial speech is relatively weak, given the profit motive behind it, *Virginia Pharmacy, supra,* 425 U.S. at 772 n.24, 96 S.Ct. at 1831 n.24; *Bates v. State Bar of Arizona, supra,* 433 U.S. at 380–81, 97 S.Ct. at 2707, it has nevertheless made clear that a restriction is invalid if a more limited restriction will achieve the purpose. *Central Hudson, supra,* 447 U.S. at 563, 100 S.Ct. at 2350. *Cf. First National Bank of Boston v. Bellotti,* 435 U.S. 765, 785 n.21, 98 S.Ct. 1407, 1420 n.21, 55 L.Ed.2d 550 (1978).

**21.** It is evident from the concurring opinion of the Chief Justice, which the prior ruling quotes at length in reaching its conclusion, that he would have decided the case on the ground that the municipality was engaged in a proprietary enterprise. 435 U.S. at 418, 98 S.Ct. at 1139. Even that concept was expressly limited to the case where "all of the parties are in a competi-

ty of the Court agreed only that a municipality is a "person" within the meaning of the antitrust laws. 435 U.S. at 391 and 408, 98 S.Ct. at 1125 and 1134. Only a plurality joined in that part of the opinion which limited the state action exemption of *Parker v. Brown* to municipal activities conducted pursuant to state policy displacing competition with regulation or monopoly public service, and that limitation, being unnecessary to the decision, is only dictum. But even if it were adopted as the rule of the case it would not be a complement to *Noerr-Pennington*. While commercial activities by municipal agencies and activities not conducted pursuant to specific state policy or authority may indeed overlap considerably, these two types of activity are neither congruent nor necessarily or logically related.[22]

There is, moreover, no necessary or logical relationship between the imposition of liability on those who advocate anticompetitive activities and on those who participate in them. Even aside from First Amendment considerations, the Sherman Act prohibits participation in, not advocacy of, anticompetitive activities. Private parties attempting to influence public officials to engage in commercial activities which may

later be found to violate the antitrust laws do not thereby become themselves liable. For liability to be imposed upon them, they must be participants in the scheme.[23]

■ Nor does the asserted relationship between *Noerr-Pennington* and *Parker v. Brown* find support in decisions on the converse proposition immunizing joint attempts to influence government action which is *not* subject to the antitrust laws. *E. W. Wiggins Airways, Inc. v. Massachusetts Port Authority*, 362 F.2d 52, 56 (1st Cir.), *cert. denied*, 385 U.S. 947, 87 S.Ct. 320, 17 L.Ed.2d 226 (1966); *Metro Cable Co. v. CATV of Rockford, Inc.*, 516 F.2d 220, 229 (7th Cir. 1975). The logic which dictates that joint attempts to influence exempt activities should be immune does not help answer the question whether liability should be imposed on joint action to influence activities which may not be exempt.

Finally, the analytical difficulties of this proposition are accompanied by grave practical problems which would be encountered in its administration. Persons contemplating joint activities to influence public officials cannot predict with any degree of certainty whether the officials or their agencies could in some future lawsuit be held

---

tive relationship such that each should be constrained ... by the federal antitrust laws," 435 U.S. at 422 n.3, 98 S.Ct. at 1141 n.3, an element not present here. The plurality chose not to accept the Chief Justice's *ratio decidendi* and the four dissenters vigorously rejected it. But even if it were accepted, it would offer little support in a case such as this where the distinction is applied for the purpose of determining the antitrust liability not of the agency engaged in the activity but of third parties merely attempting to influence that agency.

**22.** The difficulties created by this analysis are reflected in the prior ruling. *Compare In re Airport Car Rental, supra*, 474 F.Supp. at 1090 n.16: "[A]lthough the private parties may have been influencing 'commercial' activity of the state, they would probably escape liability as well ...." *with id.* at 1093 n.20: "This Court's earlier discussion of the interrelationship of *Parker* and *Noerr* should not be read as a holding that all attempts to influence government officials are immune under *Noerr* so long as the government action itself would be immune under *Parker*."

**23.** This is the necessary inference from the decisions cited in the prior ruling. *In re Airport Car Rental, supra*, 474 F.Supp. at 1090. In *Duke & Company, Inc. v. Foerster*, 521 F.2d 1277, 1282 (3rd Cir. 1975), plaintiff alleged that the private companies and the public agencies and officials had entered into a conspiracy in violation of Section 1. The court said:

Both *Noerr* and *Pennington* involved suits against private parties who had allegedly conspired to influence governmental action. In neither case was it alleged that the governmental entity had collaborated to promote the conspiracy. Where the complaint goes beyond mere allegations of official persuasion by anticompetitive lobbying and claims official participation with private individuals in a scheme to restrain trade, the *Noerr-Pennington* doctrine is inapplicable.

Similarly, in *Kurek v. Pleasure Driveway & Park Dist.*, 557 F.2d 580, 591–93 (7th Cir. 1977), it appeared from the summary of the pleadings and the court's discussion that plaintiffs were complaining of joint anticompetitive action by private parties and public officials. *But see* note 30, *infra*.

liable under the antitrust laws for engaging in the activities sought to be influenced. The "enforcement of the antitrust laws requires rules which are both predictable and workable." *Moore v. Jas. H. Matthews & Co.*, 550 F.2d 1207, 1213 (9th Cir. 1977). Nowhere is this more true than where, as here, First Amendment values are also implicated.

The problems of uncertainty would be aggravated in a suit where only private parties defend, as is the case here. The lawfulness of the absent public officials' conduct cannot then be fully litigated. Yet defendants' liability may turn on the hypothetical liability of absent public officials. To the extent that liability is founded on mere speculation, the result would be plainly unfair.[24]

### D. *The Governmental Nature of the Activities Which Defendants Sought to Influence*

Even if the Court were to adopt the exception for commercial activities urged by plaintiff, the question remains whether the relevant activities of the airport officials could be found to be anything other than governmental activities. Plaintiff's argument in support of applying a commercial activity exception, and the reasoning of the prior ruling, rest in essence on three factors:

(1) The relevant decisions affecting car rental companies were made by local municipal bodies not acting in a legislative capacity;

(2) Their decisions were not necessary to implement state legislative policies; and

(3) The decisions were motivated by sound business judgment and economic considerations.

As to the first factor, the protection afforded under *Noerr-Pennington* is not lost because the joint activities are directed at influencing local municipal bodies. The Court is aware of no authority supporting that proposition.[25] The analysis explicated in the preceding sections of this opinion, whether bottomed on interpretation of the Sherman Act or the First Amendment, leaves no room for a distinction between local municipal agencies and state agencies. The large number of such local agencies[26] demonstrates that much of the nation's governmental activity is necessarily conducted through them. To exclude them from the scope of the *Noerr-Pennington* doctrine would substantially frustrate its purpose.

As to the second factor, decisions concerning the leasing of space at airports to car rental companies are necessary to implement state legislative policies underlying the maintenance and operation of airports. Each of the relevant airports is operated by

**24.** The discussion in the following section of this opinion addressing the factors said to govern the application of a commercial activity exception shows how vague and unpredictable such a rule would be. Firms engaged in legitimate efforts to enter into business relations with a public agency on the most favorable terms obtainable would have no way of predicting the degree of risk of antitrust litigation to which they may be exposed.

**25.** To the contrary, the *Noerr-Pennington* doctrine has been repeatedly applied to attempts to influence local agencies. *See, e. g., Mark Aero, Inc. v. Trans World Airlines, Inc.*, 580 F.2d 288 (8th Cir. 1978) (city council); *Franchise Realty Interstate Corp. v. San Francisco Local Joint Executive Board of Culinary Workers*, 542 F.2d 1076 (9th Cir. 1976), *cert. denied*, 430 U.S. 940, 97 S.Ct. 1571, 51 L.Ed.2d 787 (1977) (local board of permit appeals); *Metro Cable Co. v. CATV of Rockford, Inc.*, 516 F.2d

220 (7th Cir. 1975) (city council); *Bob Layne Contractor, Inc. v. Bartel*, 504 F.2d 1293 (7th Cir. 1974) (city council and zoning board); *Lamb Enterprises, Inc. v. Toledo Blade Co.*, 461 F.2d 506 (6th Cir.), *cert. denied*, 409 U.S. 1001, 93 S.Ct. 325, 34 L.Ed.2d 262 (1972) (city council); *Sun Valley Disposal Co. v. Silver State Disposal Co.*, 420 F.2d 341 (9th Cir. 1969) (county commission); *Wilmorite, Inc. v. Eagan Real Estate, Inc.*, 454 F.Supp. 1124 (N.D.N.Y. 1977), *aff'd*, 578 F.2d 1372 (2d Cir.) *cert. denied*, 439 U.S. 983, 99 S.Ct. 573, 58 L.Ed.2d 655 (1978) (zoning board of appeals, county planning board and town board); *United States v. Johns-Manville Corp.*, 259 F.Supp. 440, 452 (E.D.Pa.1966) ("local governmental authorities").

**26.** There were said to be 62,437 different units of local government in the United States in 1972. *Lafayette v. Louisiana Power & Light Co., supra*, 435 U.S. at 407, 98 S.Ct. at 1133.

agencies created by the legislature and vested with broad powers. The Seattle-Tacoma and Spokane airports operate under Washington law which declares that airports are a "public purpose." RCW 14.08.-020. Under that statute, the "acquisition, establishment, construction, enlargement, improvement, maintenance, equipment and operation of airports ... are ... declared to be public, *governmental*, county and municipal *functions*, exercised for a public purpose, and matters of public necessity ...." (Emphasis added.) Municipalities operating the airports are specifically empowered "to confer the privileges of concessions of supplying upon its airports goods, commodities, things, services and facilities" for the "rightful, equal and uniform use" of the public. RCW 14.08.120(4). Airport officials are further authorized to determine the proper charges, terms and conditions under which its properties, services and accommodations may be used, provided that "the public is not deprived of its rightful, equal and uniform use ...." RCW 14.08.120(6). The Sea-Tac Port District has the power to acquire, build, maintain, operate, develop and regulate air transfer and terminal facilities within its district. RCW 53.04.010. Its regulatory powers are considerable. It may "formulate all needful regulations for the use by tenants, agents, servants, licensees, invitees, suppliers, passengers, customers, shippers, business visitors and members of the general public by any properties or facilities owned or operated by it ...." RCW 53.08.220.

The Oregon airports operate under a similar grant. Oregon municipalities are empowered to "acquire, establish, construct, expand or lease, control, equip, improve, maintain, operate, police and regulate airports ...." ORS 492.310. All lands acquired in furtherance of this goal are used for "public and *governmental*" purposes. ORS 492.320 (emphasis added). The purpose and general powers of the Port of Portland are to promote the port's aviation interests, ORS 778.015, and to that end the port may take any "requisite, necessary and convenient" action. It is specifically empowered to "purchase ... construct, oper-

ate, maintain, lease, rent ... airports ... and all other facilities incident to the development, protection and operation of the port and air transport ...." ORS 778.-025(5).

These statutes reflect a clear legislative purpose to make the operation of these airports a governmental activity. That conclusion is consistent with decisions in other circuits. In *Amersbach v. Cleveland*, 598 F.2d 1033 (6th Cir. 1979), the court held the operation of the Cleveland airport to be a governmental activity for purposes of the Fair Labor Standards Act (29 U.S.C. § 201, *et seq.*), relying on these elements:

(1) the service benefits the community as a whole and is available to the public at little or no direct expense;

(2) the service is undertaken for the purpose of public service rather than for pecuniary gain;

(3) government is the principal provider of the service; and

(4) government is particularly suited to provide the service because of a communitywide need for it.

598 F.2d at 1037. *See also Mark Aero, Inc. v. Trans World Airlines, Inc.*, 580 F.2d 288 (8th Cir. 1978).

If the maintenance and operation of a public airport is a governmental activity, there is no rational justification for bifurcating some parts of that activity into a nongovernmental category. The legislative enactments here clearly contemplate that the local airport authorities would lease space to and contract for services by private firms (inescapable features of operating an airport) and impose no restrictions on how this is to be done. Moreover, providing facilities for ground transportation is as essential as providing airline facilities themselves, for an airport which departing passengers cannot conveniently reach and arriving passengers cannot conveniently leave is of little use. As the court said in *Padgett v. Louisville & Jefferson County Air Board*, 492 F.2d 1258, 1260 (6th Cir. 1974):

In the instant case, the state has legislatively created an instrumentality, the

Air Board, whose charge is, inter alia, to operate the airport. There is no question in our own minds but that the regulation of ground transportation services is necessarily incident to the management and operation of the airport facilities. Air travelers require ground transportation and it would follow that the Board, as the agent of the state in performing this function, would have a duty to provide adequate and reliable services. In responding to this duty the Board has taken what we view as the not unreasonable position that noncontracting taxi operators may not provide services at the airport unless they first obtain the Board's permission. Given the circumstances of the public invitation for bids and the broad statutory grant of power to manage and operate a virtual monopoly in the public interest, we conclude that the Board in contracting for cab service at the airport was exercising a valid governmental function to which the antitrust laws do not apply.

See also E. W. Wiggins Airways, Inc., supra, (port authority's decision to enter into exclusive lease with airport fixed base operator was exercise of governmental function under state legislation authorizing it to operate airport).[27]

Power to lease space and contract for services necessarily comprehends authority to decide the amount of space to lease, the standards and requirements to be applied to the services, and the number and identity of the lessees and contractors. While business and economic considerations are implicated in such decisions, so are policy questions.[28]

This is not a case in which the agencies themselves are charged with having engaged in activities violating the antitrust laws. It must be distinguished from the cases in which the municipalities along with private parties were alleged to have engaged in exclusionary activities. Cf. Woolen v. Surtran Taxicabs, Inc., 461 F.Supp. 1025 (N.D.Tex.1978); Guthrie v. Genesee County, N.Y. Prior Aviation Service, 494 F.Supp. 950 (W.D.N.Y.1980). In those cases the governmental character of the activity under Parker v. Brown and Lafayette was critical to the application of the antitrust laws to the public agencies. No such issue is present here. Plaintiff has made no showing that the public agencies' actions defendants sought to induce were, or would have been unlawful in themselves and therefore not governmental.[29]

As to the third factor, the decisions of the public officials did not cease to be governmental by reason of being motivated by economic considerations and sound business judgment. That public activities should be stigmatized because they seek to maximize revenue is wholly without support either in precedent or reason, particularly in a period of economic stringency and governmental retrenchment.

It may be that activities undertaken for the primary purpose of pecuniary gain should be treated differently from governmental activity, but there is no evidence to suggest that the airports in question are operated for that purpose. See Amersbach, supra, 598 F.2d at 1037.

### E. The Application of the Sham Exception

The so-called sham exception derives from the Court's statement in Noerr that

[t]here may be situations in which a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually

---

27. The Padgett, Wiggins and Mark Aero decisions are cited only for their analysis of what constitutes a governmental activity. Whether, in light of the subsequent decision in Lafayette, supra, they continue to be authoritative on the application of Parker v. Brown, supra, is a different issue which need not be addressed here.

28. Among other things, airport authorities must take into account such obvious policy issues as environmental impact, equal employment opportunity, restrictions on available tax revenues, and the extent of competition desired among concessionaires.

29. The allegations in the complaint that the airport authorities were coconspirators are discussed in the text at note 30.

nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified. 365 U.S. at 144, 81 S.Ct. at 533. In *California Motor Transport, supra,* the Court elaborated on the concept. There the Court found a claim to have been stated where it was alleged that defendants conspired to harass and deter plaintiffs in their use of administrative and judicial proceedings so as to deny them access to the regulatory agencies from which they required operating authorities. 404 U.S. at 511, 92 S.Ct. at 612.

■ It is not necessary to explore fully the various applications of the sham exception to dispose of this case. It is clear enough that the exception may apply when processes which might otherwise be protected by the First Amendment are used not to advance a party's economic objectives but to inflict injury on another, as, for example, through the maintenance of a pattern of baseless litigation. *See Otter Tail Power Co. v. United States,* 410 U.S. 366, 380, 93 S.Ct. 1022, 1031, 35 L.Ed.2d 359 (1973). It may also apply when, through fraud or bribery, for example, these processes are corrupted. *See California Motor Transport, supra,* 404 U.S. at 513, 92 S.Ct. at 613. And it may apply where the public officials are themselves participants in the conspiracy. *See Federal Prescription Service v. American Pharmaceutical Asso.,* 484 F.Supp. 1195 (D.D.C.1980).

Defendants have denied engaging in any activities implicating the sham exception. At this stage of the litigation, plaintiff "may not rest upon the mere allegations . . . of [its] pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see Mutual Fund Investors Inc. v. Putnam Management Co.,* 553 F.2d 620 (9th Cir. 1977); *ALW, Inc. v. United Air Lines, Inc.,* 510 F.2d 52 (9th Cir. 1975); *First National Bank of Arizona v. Cities Services Co.,* 391 U.S. 253, 289–90, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968). The Court must therefore examine the facts put forward by plaintiff in response to this motion to determine whether they raise a genuine issue for trial.

### (1) Port of Seattle, Sea-Tac International Airport

■ Plaintiff claims that the lease agreements between the Port and the individual defendants contained "most favored nation" clauses; but in fact the relevant provision states:

14. *NONEXCLUSIVE RIGHTS* : It is mutually agreed that the rights, privileges and occupancy granted to the Lessee hereunder are nonexclusive and shall not in any way affect the right of the Port to make a similar agreement or agreements with other parties.

(Ex. 24 para. 14.) While the agreements obligated the Port to charge all licensees the same minimum guarantee (Ex. 46), they did not preclude it from negotiating and entering into lease agreements with another car rental company.

Plaintiff also offers evidence said to show that defendants' representatives coordinated their negotiations with the Port (Ex. 43), and met jointly with Port officials to discuss the terms of the lease agreements (Ex. 48) and to present standards and criteria which the Port should require of lessees, including minimum guarantees. (Ex. 49, 50.) Among the terms discussed were concession fees, defendants urging that if additional companies entered the market, the percentage fee to be paid by each should be reduced since no additional business would be generated and the existing business would be divided among more firms. (Exs. 52, 54.) Also discussed were criteria which a company should have to meet to provide airport service. (Exs. 53, 59, 60.) Finally, defendants participated in a series of meetings with Port officials in which they unsuccessfully opposed on economic grounds the entry of additional car rental companies into the on-airport market. (Exs. 60–64, 69.)

From the facts presented, viewed in a light most favorable to plaintiff, a trier of fact could find that defendants, separately and jointly, negotiated with the Port over the various terms of the lease agreements which, as finally executed, required car

rental companies offering on-airport service to meet certain qualifications and pay guaranteed minimum fees, but did not preclude the Port from entering into such agreements with other companies. Even if a trier of fact could find that the terms for which defendants negotiated were favorable to them and unfavorable to plaintiff and served to delay plaintiff's entry into this market as claimed, these facts, if they state a claim cognizable under the Sherman Act at all, prove nothing other than a classic case for application of the *Noerr-Pennington* doctrine. They do not bring the case within the sham exception.

### (2) Port of Portland, Portland International Airport

■ As in the case of Seattle, the lease contracts between defendants and Portland were nonexclusive:

> The concession herein granted is not an exclusive concession and the Port shall have the right to deal with and perfect arrangements with any other individual, company or corporation for engaging in like activity at the airport; provided, however, that any other or future non-exclusive concession for U-drive operations shall not be on terms or conditions more favorable to said other or future concessionaire than are granted to Concessionaire herein, and provided further that, after receipt of applications for this concession at 2 P.M., Pacific Standard time, May 6, 1957, and after the Port has accepted the applications and executed contracts with at least one concessionaire, no future automobile rental concessionaire will be considered for or granted the right to operate at the Airport until at least two (2) years have elapsed from the commencement date of this agreement, said commencement date being more fully described in Article IV, herein, and provided further that the term of lease of any future concessionaire shall not initially extend beyond the termination date of this lease.

(Ex. 32.) The evidence offered by plaintiff shows that in the early 1960's, a fourth car rental company operated at the Portland airport in addition to defendants but voluntarily discontinued operations. Defendants urged, although unsuccessfully, that the Port not permit another company to fill the space because experience had shown that there was insufficient business and offered to pay increased fees to compensate for any loss. (Exs. 72, 73, 74.) Subsequently defendants, along with Airways Rent-A-Car which also was a concessionaire at Portland, opposed a joint airline-car rental operation by which plaintiff would offer service at the airline's counter. (Ex. 75.)

Defendants jointly negotiated with the Port over modifications of their contracts and over problems created by off-airport operations. (Exs. 76, 77.) When Hertz sold some of its used cars, it advised the Port that employees would qualify for a "special $25.00 allowance off the sale price of the car." (Ex. 79.) Hertz also offered, as a door prize for the Port's employees Christmas Party, a free weekend rental. (Ex. 80.) And Avis sent a form letter to the Port's aviation manager, inviting him to accept membership in the Avis President's Club. (Ex. 81.)

Giving plaintiff the benefit of all favorable inferences, these facts would not permit a finding of a conspiracy between defendants and the Port or a denial of access. The sham exception is inapplicable.

### (3) Spokane Airport Board, Spokane International Airport

■ The facts show that at the urging of defendants, the airport adopted a qualifying fee for car rental companies which was finally reduced to $4,800. (Exs. 83, 84.) When plaintiff applied for space, defendants objected on the ground that there was an insufficient volume of business at the airport to support four licensees. (Exs. 85, 86, 87, 88, 89.) At a later time, Hertz and National stated that they would meet the competition of lower rates. (Ex. 93.)

There is here no evidence which could support application of the sham exception.

### (4) Eugene Airport Commission, Mahlon Sweet Field

Plaintiff offers no evidence to support the application of the sham exception here.

Finally, plaintiff alleges that various airport authorities conspired with defendants

to exclude it from the airports. While the validity and extent of a "coconspirator" exception to *Noerr-Pennington* are open to question,[30] the facts offered by plaintiff in support of its claim that airport officials were coconspirators are so patently deficient that the Court need not reach the question in this case.

In sum, on the facts offered by plaintiff, "there is no conceivable basis for arguing that defendants' conduct was a sham rather than a genuine effort to influence [official] action." *Metro Cable, supra*, 516 F.2d at 232. If plaintiff suffered injury, "it was caused by the governmental action which defendants genuinely attempted to secure ...." *Id.*

## IV. CONCLUSION

The Court concludes that, as a matter of law:

(1) The activities of defendants complained of were not within the scope of the Sherman Act;

(2) Even if those activities were cognizable under the act, they are protected by the *Noerr-Pennington* doctrine

(a) regardless of whether they related to commercial activities by the public officials, or, alternatively,

(b) because the activities sought to be influenced were governmental, and, in either case,

(c) because plaintiff has come forward with no facts to support application of the sham exception.

For the reasons stated, defendants are entitled to judgment against plaintiff Budget Rent A Car of Washington-Oregon, Inc. Because this ruling affects all of the other cases consolidated in this docket, the Court will defer entry of judgment. Plaintiffs in the other actions may, if they wish, file memoranda on or before May 18, 1981, stating why judgment should not be entered against them upon one or more of the grounds of this ruling. Any response by defendants shall be filed by June 8, 1981. The Court will thereafter advise the parties if a further hearing is deemed necessary before judgment is entered.

IT IS SO ORDERED.

---

**30.** While under *Lafayette v. Louisiana Power & Light Co., supra*, public agencies and officials may in the proper case be subject to liability for violating the antitrust laws, whether private defendants may lose the protection of *Noerr-Pennington* because public officials collaborated with them is a different question. Two appellate decisions have so held in the context of passing on the sufficiency of pleadings only. *Harman v. Valley National Bank of Arizona*, 339 F.2d 564 (9th Cir. 1964); *Duke & Company, Inc. v. Foerster*, 521 F.2d 1277, 1282 (3rd Cir. 1975). *See also Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 707, 82 S.Ct. 1404, 1414, 8 L.Ed.2d 777 (1962), where the participant in the conspiracy was a private corporation to which official authority had been delegated by the government. Two courts have reached the contrary conclusion. *Sun Valley Disposal Co. v. Silver State Disposal Co.*, 420 F.2d 341, 342–43 (9th Cir. 1969); *Metro Cable Co. v. CATV of Rockford, Inc.*, 516 F.2d 220, 229–30 (7th Cir. 1975). The resolution of this apparent conflict may turn on whether the actions of the public officials were within the scope of their authority and whether the private activities, notwithstanding the collaboration, were genuine efforts to influence lawful official action. *Cf. Kurek v. Pleasure Driveway & Park Dist., supra*, 557 F.2d at 592–94. For purposes of this decision, however, the Court will assume that the coconspirator exception would be available to plaintiff.