**GREYHOUND RENT–A–CAR, INC., a Florida Corporation, Plaintiff-Appellant,**

v.

**The CITY OF PENSACOLA, a Florida Municipality; Dollar Rent-A-Car System, Inc., et al., Defendants-Appellees.**

No. 81–5243.

United States Court of Appeals, Eleventh Circuit.

May 28, 1982.

Thomas W. Lager, Douglas C. Kearney, Tallahassee, Fla., William VanDercreek, Dallas, Tex., for plaintiff-appellant.

D. L. Middlebrooks, Barry Silber, Joe J. Harrell, Pensacola, Fla., Theodore F. Schwartz, Barry S. Ginsburg, Clayton, Mo., for defendants-appellees.

Before GODBOLD, Chief Judge, HILL and FAY, Circuit Judges:

JAMES C. HILL, Circuit Judge:

Greyhound Rent-a-Car, Inc. (Greyhound) appeals from an adverse jury verdict rendered in its antitrust suit against the City of Pensacola, Florida (City) and Dollar Rent-a-Car Systems, Inc. (Dollar). For the reasons developed below, we affirm.

I

Greyhound and Dollar are two of five car rental companies who submitted bids for on-airport car rental concessions at the Pensacola Regional Airport.[1] The City planned to award no more than four concessions to the highest bidders. When the opening of the sealed bids on January 15, 1979 revealed Dollar to be the lowest bidder,[2] Dollar objected that Greyhound was disqualified from bidding because of its failure to meet the performance ability specifications in the bid package. These specifications, carried over from the City's 1968 and 1973 bid packages into the 1978 package, provided in part:

[I]n order to be qualified to submit a bid, bidder must be capable of providing the following services for its customers at the Pensacola Regional Airport:

(a) National credit card system

(b) National reservation system

(c) "Rent-it here, Leave-it there" service.

(d) Must provide bodily injury and property damage liability insurance as primary coverage and not as excess of customer's liability insurance coverage.

Also, each bidder must have been engaged in the automobile rental business on a national scale for at least five years immediately prior to the date its bid is submitted . . . .

Plaintiff's Exhibit 47 at 4. In particular Dollar asserted that Greyhound had not operated its car rental business "on a national scale" for the immediately preceding five years because it had rental locations in only five states. Dollar also questioned Greyhound's compliance with the requirements of a national credit card system, a national reservation system, and primary liability insurance coverage. Plaintiff's Exhibit 87. Greyhound responded that it did qualify, contending that its maintenance of offices in Florida, Georgia, Louisiana, and Arizona and its recent expansion into Nevada, California, and Colorado constituted a national scale operation. Plaintiff's Exhibit 89.

After reviewing this dispute and discussing it with the city attorney and the airport manager, the city manager advised a committee of the city council that the specifications in question served the material purpose of insuring "a consistently high level of service to the travelling public . . . which combines maximum convenience to the pub-

1. The three remaining bidders were Hertz Corp., National Car Rental System, Inc., and Avis Rent-a-Car System, Inc.

2. The minimum revenue guaranteed to the City by each of the bidders for the five-year period of the concession contracts was: Hertz—$410,000; National—$365,484; Greyhound—$361,081; Avis—$343,716; Dollar—$277,600. Plaintiff's Exhibit 62.

lic, uniform ability to provide service throughout the United States, and a common basis for competition among all concessionaires." Plaintiff's Exhibit 62. On this basis the city manager recommended that Greyhound be disqualified for failure to operate on a national scale and that contracts, be awarded to Hertz, National, Avis, and Dollar.

At the city council meeting which followed on February 5, 1979, Greyhound protested that the City's national scale requirement constituted an unlawful restraint on competition. Plaintiff's Exhibit 48 at 9–11.[3] Dollar's counsel advised the City that it saw no antitrust liability on the part of either Dollar or the City if the City chose to enforce its specifications and reject Greyhound's bid. *Id.* at 5. The city attorney also informed the council that his research had revealed one court decision defining a national operation as one carried on in over half the states.[4]

Concerned about the City's exposure to liability, the council deferred action on the award of bids for two weeks pending further investigation.[5] During this time the city attorney approached Dollar's local counsel about Dollar's indemnifying the City from any lawsuit resulting from invalidation of Greyhound's bid. Transcript, vol. X, Testimony of Don Caton at 50. In response Dollar's vice-president sent a telegram to Dollar's local counsel authorizing

him "acting on behalf of Dollar Rent-a-Car Systems, Inc. to enter an indemnification agreement with the City of Pensacola . . . [to] indemnify the City from any lawsuits or claims resulting from the rejection of the bid of Greyhound Rent-a-Car by the City of Pensacola." Plaintiff's Exhibit 158. In turn Dollar's local counsel provided the city attorney with a letter reciting his authority to indemnify the City for "all costs and damages which may be assessed against the city in the event the contract . . . is awarded to Dollar, and complaint or other form of legal action is taken against the city by reason thereof." Plaintiff's Exhibit 157. Finally on February 22, 1979, the council voted, without any discussion of indemnification,[6] to award the concession contracts to Hertz, National, Avis, and Dollar. Plaintiff's Exhibit 50 at 27.

Greyhound subsequently commenced this suit under § 1 of the Sherman Act, 15 U.S.C. § 1, on the theory that Dollar and the City had contracted, combined, or conspired to exclude it from being awarded a car rental concession at the airport. According to Greyhound, the evidence it adduced at trial established a boycott within the pattern of *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), a restraint which the Supreme Court has condemned as a per se violation of the Sherman Act.[7] On appeal Greyhound complains of the district court's

---

**3.** Greyhound's counsel referred specifically to a consent decree entered by the Federal Trade Commission against Hertz, National, and Avis prohibiting each of these companies from, *inter alia*, conspiring with competitors to obtain airport car rental bid specifications or concession contracts containing such requirements as a national credit card system, national reservation system, one-way rental service, operation at a minimum number of airports or for a minimum number of years, and operation on a national scale. The decree further prohibited the companies from recommending the inclusion of these provisions in bid packages and concession agreements. *Hertz Corp.*, 88 F.T.C. 715 (1976).

**4.** Theretofore the meaning of the specification requiring operation "on a national scale" had not been defined.

**5.** The councilman who moved to postpone action on the matter expressed his concern this

way: "[B]asically we look like we are looking at a law suit either way we want to go, . . . and I just think we ought to take a look at it . . . ." Plaintiff's Exhibit 48 at 21.

**6.** The city attorney testified that he did not bring the existence of any indemnity agreement to the councilmen's attention before they voted. Transcript, vol. X, Testimony of Don Caton at 83–84. The minutes of the council meeting also reveal no discussion of indemnification. Plaintiff's Exhibit 50.

**7.** In *Klor's* the Supreme Court held that a group boycott forbidden by the Sherman Act was stated by the allegations of the plaintiff retail store that national appliance manufacturers had conspired among themselves and with the plaintiff's retail competitor not to sell to plaintiff or to sell only on unfavorable terms.

submission of the case to the jury under a rule of reason rather than a per se instruction and, even if a rule of reason instruction was warranted, of error within the charge given. Greyhound further attacks two evidentiary rulings made by the trial judge: (1) the admission of the city attorney's testimony that he found no evidence of an antitrust violation by the City, and (2) the exclusion of an exhibit indicating Dollar's increase of its bid after learning there were five, rather than four, bidders.

We affirm the entry of judgment against Greyhound because we conclude there was insufficient evidence to establish any contract, combination, or conspiracy between Dollar and the City within the meaning of § 1 of the Sherman Act. Greyhound having failed to prove the first element of its § 1 claim, we need not therefore address the challenges it presents to the jury instructions and to the admission and exclusion of evidence unrelated to the issue of agreement.

## II

*United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919), established that the Sherman Act does not restrict the right of a trader "freely to exercise his own independent discretion as to parties with whom he will deal" and to announce in advance the terms on which he will deal. Hence the right of the City in this case to deal only with parties who meet certain specifications that the City deems material and to refuse unilaterally to deal with Greyhound if it fails to comply with these specifications cannot be questioned.[8] Greyhound contends, however, that this case presents something more than the City's individual refusal to deal with it. Although *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), indicates that an individual refusal to deal may violate the Sher-

man Act when it is supported by an agreement with the victim's competitor, we cannot find in the record evidence of an agreement between the City and Dollar within the meaning of the "contract, combination . . . or conspiracy" language of § 1 of the Sherman Act.

■ The essence of a contract, combination or conspiracy which is condemned by § 1 is an agreement or mutual commitment to engage in a common course of anticompetitive conduct. As Professor Sullivan states: "The bottom layer of the analysis is always the finding that concerted action did occur, that conspirators . . . came to terms on a common course to be concertedly followed." L. Sullivan, *Handbook of the Law of Antitrust* § 109 at 313 (1977). The facts of this case raise three possible theories for alleging a concert of action or conspiracy between the City and Dollar. Each is unavailing for Greyhound.

■ First, had Dollar induced the City to insert the national specifications in the bid packages, Greyhound could have cleared at the least the first hurdle of its § 1 claim.[9] Similarly if Dollar had induced the City to adopt a definition of "national scale" that would automatically disqualify Greyhound as a bidder, the element of combination would be satisfied. But evidentiary support for either of these theories is lacking. There is clear, uncontradicted testimony that the City had no discussion or contact with any of the bidders regarding use of the national specifications. Transcript, vol. XII, Testimony of Edmond R. Hinkle at 168–69; Depositions, vol. IX, Deposition of Gary Paxton at 83, 94–95; Transcript, vol. XIII, Testimony of James Reeves at 352. Furthermore, the definition of operating on a "national scale" as requiring business in more than half the states was solely the product of the city attorney's independent

---

8. On appeal Greyhound has not pursued the argument that the "national scale" requirement, standing alone and apart from its use as the result of a conspiracy, offends antitrust laws. We do not address that question.

9. We do not comment on whether such a conspiracy would constitute an unlawful restraint

of trade. *Cf. In re Airport Car Rental Antitrust Litigation*, 521 F.Supp. 568 (N.D.Cal.1981), *appeal docketed*, No. 81–4399 (9th Cir. Aug. 5, 1981) (*Noerr-Pennington* doctrine precludes liability for agreement between airport officials and rental car companies regarding eligibility requirements and terms of concession contracts).

research. Transcript, vol. X, Testimony of Don Caton at 36, 77.

The most promising theory, and the one on which Greyhound relies, is that the indemnity agreement between Dollar and the City reflects the defendants' commitment to a common course of action, namely the City's exclusion of Greyhound and award of a contract to Dollar in exchange for Dollar's payment of any damages and costs incurred in legal proceedings arising from the City's actions.[10] Greyhound would have us view the indemnity agreement as reading in effect: "For and in consideration of Dollar's promise to indemnify, the City hereby promises to reject the bid of Greyhound Rent-a-Car." This interpretation of the agreement cannot be supported by either the language of the agreement or by any inference drawn from the City's subsequent decision to disqualify Greyhound's bid.

■ The language of the agreement reveals that the City did not commit itself either to reject Greyhound or to any other particular course of action. It was Dollar which committed itself to certain conduct— namely, indemnification of the City *in the event that* the City chose, for whatever reason, to reject Greyhound and litigation ensued.[11] Furthermore, there is nothing in the record to suggest that the city council's ultimate decision to reject Greyhound was induced or supported by the indemnity agreement with Dollar. It is true that a city councilman initially voiced concern about the City's potential liability and the desirability of indemnification at the February 5 council meeting. Plaintiff's Exhibit 48 at 21. There is no indication, however, that the council charged the city attorney with the task of entering into a bargain with Dollar for indemnification. Moreover, there is uncontradicted testimony that the councilmen were not informed of an indemnity agreement prior to their vote on February 22, Transcript, vol. X, Testimony of Don Caton at 83–84, and that the councilmen were swayed by their view that the national scale specification was a material requirement necessary to ensure convenient and reliable service to the travelling public. Transcript, vol. XIII, Testimony of James Reeves at 352–54; *id.*, testimony of Albert Klein, Jr. at 387–88; *id.*, Testimony of Franklin Pryor at 396–97; *id.*, Testimony of Harold Rose at 401–02, 404–05. The indemnity agreement therefore does not reflect a mutual commitment by the City and Dollar to exclude Greyhound. In short, it does not evidence the defendant's coming to terms on a common course of action to be concertedly followed.

In light of the lack of evidence to establish a contract, combination, or conspiracy

---

**10.** Apparently there is some dispute between the defendants regarding Dollar's agreement to indemnify the City. According to the city attorney's testimony, the City regarded the letter of Dollar's local counsel reciting his authority to indemnify the City (Plaintiff's Exhibit 157) as sufficient evidence of Dollar's obligation at the time of the letter's receipt. After this litigation commenced, however, the City sought to formalize the indemnity agreement. The city attorney prepared a rough draft of a proposed agreement and sent it to Dollar. Transcript, vol. X, Testimony of Don Caton at 56. Dollar's vice-president, who testified to receiving this document, refused to sign it. *Id.*, Testimony of Gary Paxton at 63. This document was the subject of a request for production and subsequently of Greyhound's motion to compel production and for sanctions. Both the city attorney and Dollar's vice-president testified that they had not retained, or could not locate, a copy of that document. *Id.*, Testimony of Don Caton at 57--58; Testimony of Gary Paxton at 65.

We do not purport to resolve any questions regarding the enforceability of Dollar's agreement to indemnify or the extent of Dollar's obligation. For purposes of our inquiry into the existence of a contract, combination, or conspiracy, we note only that it is undisputed that *some* kind of agreement exists. Dollar's vice-president acknowledged the existence of some "understanding" with the City regarding indemnification, although he disputed the existence of an "agreement" regarding the details. *Id.*, Testimony of Gary Paxton at 61. Moreover, the City judicially admitted under Rule 36 that "Dollar agreed to indemnify, hold harmless or otherwise protect the city from litigation that Greyhound might file if its bid were rejected." *Id.*, vol. XI, at 76.

**11.** Again we caution that we express no views on the legal enforceability of Dollar's obligation. Our comment is directed solely to the language of Plaintiff's Exhibit 157 insofar as it is pertinent to finding a contract, combination, or conspiracy between the defendants. *See* note 10 *supra.*

within § 1 of the Sherman Act; the judgment of the district court in favor of Dollar and the City is

AFFIRMED.