TRANSPORT LIMOUSINE OF LONG ISLAND, INC., Plaintiff,

v.

The PORT AUTHORITY OF NEW YORK AND NEW JERSEY; Peter Goldmark, Executive Director of the Port Authority Aviation Department; Kelsey A. Moffett, Assistant Manager of Port Authority Business Administration Division; Long Island Airports Limousine Service, Inc. and Walter Stuart, Defendants.

No. CV 81-1339.

United States District Court, E.D. New York.

April 20, 1983.

Pascarella, Dehler, Illmensee & Carra, Garden City, N.Y., for plaintiff; James A. Pascarella and Thomas A. Illmensee, Garden City, N.Y., of counsel.

Patrick J. Falvey, New York City, for The Port Authority.

William M. Stewart, New York City, for Long Island Airports Limousine Service, Inc.

*Memorandum of Decision and Order*

MISHLER, District Judge.

Transport Limousine of Long Island, Inc. ("Transport") brought this action to challenge the fee imposed on Transport by the Port Authority of New York and New Jersey ("Port Authority") for certain services provided at John F. Kennedy International Airport ("Kennedy") and LaGuardia Airport ("LaGuardia"). Transport claims, *inter alia,* that the charge of eight percent (8%) on gross receipts is illegal and in violation of the Constitutions of the United States and New York State, the Sherman Antitrust Act and the Airport and Airway Development Act of 1970 ("AADA"). Transport also seeks damages for violation of its civil rights under 42 U.S.C. § 1983. Defendants (the Port Authority, the individual defendants named as officials and employees of the Port Authority, Long Island Airports Limousine Service, Inc. ("L.I. Limousine") and Walter Stuart, its president), move for summary judgment pursuant to Rule 56, Fed.R.Civ.P.

The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331. For the reasons set forth below, we grant defendants' motion and dismiss the complaint.

FACTS

The following facts are not in dispute.

The Port Authority is a bi-state agency, created in 1921 by an interstate compact between New York and New Jersey for the purpose of, *inter alia,* operating public transportation terminal facilities, including Kennedy and LaGuardia Airports, on a self-sustaining basis.[1] The Port Authority commenced operating Kennedy and LaGuardia in 1948 under a lease from the City of New York.

---

1. Article XV of the interstate compact provides:

> Unless and until the revenues from operations conducted by the port authority are adequate to meet all expenditures, the legislatures of the two states shall appropriate, in equal amounts, annually, for the salaries, office and other administrative expenses, such sum or sums as shall be recommended by the port authority and approved by the governors of the two states, that each state obligates itself hereunder only to the extent of one hundred thousand dollars in any one year.

1921 Port Compact, Ch. 154, Laws of N.Y., 1921; Ch. 151, Laws of N.J., 1921.

The states have not been called upon for subsidies since 1935.

Defendant, L.I. Limousine, has operated a bus line with designated stops (bus line) between points in Nassau and Suffolk Counties and Kennedy and LaGuardia Airports since 1962 under an exclusive grant of authority from the New York State Department of Transportation ("DOT"). In 1968, L.I. Limousine supplemented this service by establishing a door-to-door limousine service as a contract carrier, as authorized by DOT.

At the time the Port Authority began operating the airports in 1948, L.I. Limousine had a permit to use counter space and phone locations at the airports for the purpose of soliciting passengers. The charge was 10% of the gross receipts. The fee was continued by the Port Authority as to L.I. Limousine and all other limousine and bus company permittees using such counter facilities and telephone service.[2] The Port Authority reduced the fee to 8% in or about November 1978. In contrast, all non-permittee vehicles, including buses, taxicabs and private vehicles, have unlimited free access to the airports for the purpose of discharging and picking up passengers.[3]

Transport is a corporation, organized on July 21, 1976, with its principal place of business in Bohemia, Suffolk County, New York. On November 5, 1976, Transport applied to DOT for contract carriage authority (door-to-door service) between the airports and Nassau and Suffolk Counties. DOT granted a certificate of authority on March 28, 1978 respecting service between the airports and Suffolk County. On February 22, 1979, DOT granted the additional authority to include Nassau County. DOT denied Transport's application, filed in September, 1979, for authority to operate a bus line similar to that operated exclusively by L.I. Limousine.[4]

On November 29, 1977, Transport applied for a permit to use counter space and telephone service at Port Authority terminals including Kennedy and LaGuardia. The Port Authority declined to act on the application until a certificate of authority was issued by DOT. When authority was granted as to Suffolk County, action on the application was withheld until it became apparent that authority would be extended to Nassau County. On January 24, 1979, in anticipation of the grant of authority respecting Nassau County, the Port Authority mailed the privilege and space permits to Transport for signature. In the meantime, airport terminal counters and phone service were made available to Transport for the solicitation of passengers at the airports. On February 21, 1979, Transport mailed a check in the amount of $7,000 to the Port Authority as an "interim payment," but failed to execute the permits which would have obligated Transport to pay 8% of its gross receipts. Transport questioned the effective date of the permit and the date it would become obligated to pay the fee on its gross receipts. On June 22, 1979, Transport remitted a payment of $9,000 to the Port Authority, noting that it represented 8% on all receipts from February 21, 1979. On October 17, 1979, a revised privilege permit was mailed to Transport with the effective date left open. The accompanying letter advised Transport:

> We must still agree upon the date and our agreement must be supported by evidence such as telephone company bills or telephone installations.

2. The services to permittees include (1) manned counters at all Port Authority terminals, (2) manned counters and/or "courtesy" phones in all airline terminals, (3) separate roadways in front of or adjacent to terminals and waiting/parking areas, and (4) on and off airport promotion and advertising benefits resulting from Port Authority public service activities. (Sloane Aff., verified 5/15/81, ¶¶ 6–14).

3. Apparently some airports charge a toll or fee to non-permittee transportation companies upon entering the airport. (Sloan Aff., supra, p. 2).

4. In denying the application, DOT stated:
 Transport Limousine of Long Island, Inc. having failed to submit data to amplify its application, and the Commissioner of Transportation having determined that the application should be denied.
 Reply Brief in Support of L.I. Limousine's Motion for Summary Judgment at p. 3.

The parties finally agreed on an effective date of May 1, 1979. On September 18, 1980, William E. Schoolman, president of Transport, wrote to the Port Authority advising it that Transport was not yet ready to sign the permit since it had obtained a new accounting firm to review the records. A meeting was held at the office of Patrick J. Falvey, General Counsel and Assistant Executive Director of the Port Authority with Transport's counsel. Transport was advised that eviction proceedings would be commenced if the controversy was not resolved. A letter was mailed to Transport's counsel on March 4, 1981 setting forth the Port Authority's understanding of the settlement of all differences between the parties. Transport's counsel forwarded the letter to Transport on March 11, 1981. Mr. Falvey continued to attempt to resolve the differences with John V. Lindsay of the firm of Webster & Sheffield. On May 4, 1981, Transport instituted this lawsuit, represented by Pascarella, Dehler, Illmensee & Carra.

## DISCUSSION

### *The Standard For Summary Judgment*

 The burden rests with the moving party "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *United States v. One Tintoretto Painting,* 691 F.2d 603, 606 (2d Cir.1982). Initially, the plaintiff is required to present "evidence on which, taken by itself, it would be entitled to a directed verdict." *Donnelly v. Guion,* 467 F.2d 290, 293 (2d Cir.1972). The party opposing summary judgment "must set forth specific facts showing that there is a genuine issue for trial." Rule 56(e), Fed. R.Civ.P. "[T]he mere possibility that a factual dispute *may* exist, without more, is not sufficient to overcome a convincing presentation by the moving party." *United States v. Potamkin Cadillac Corp.,* 689 F.2d 379, 381 (2d Cir.1982) citing *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir.1980). "[T]he court should

resolve all ambiguities and inferences to be drawn from the underlying facts in the light most favorable to the party opposing the motion." *United States v. One Tintoretto Painting, supra,* 691 F.2d at 606.

Generally, cases involving constitutional and civil rights questions do not lend themselves to summary disposition. *See* Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 2732.2 (1983). This case, however, does not present issues usually present in claims of constitutional or civil rights violations (i.e., reasonableness of conduct, intent, good faith, etc.), that would preclude summary disposition. We find that the matter before us does not raise a genuine issue as to any material fact.

All of Transport's claims arise out of the 8% charge on the gross receipts of privilege permittees, as assessed by the Port Authority. The plaintiff states:

The central issue in the case deals with the economic restraints resulting from the Port Authority's requirement that companies, such as Transport, execute a privilege permit fee for "non-exclusive" use of the airport roads, which obligates the permittee to pay eight percent of its gross receipts to the Port Authority. Transport maintains that the privilege permit 8 percent gross receipts requirement violates the Commerce Clause and the Equal Protection Clause of the Fourteenth Amendment to the Constitution and the Airport and Airway Development Act of 1970. Plaintiff asserts that the Port Authority's violation of the Airport and Airway Development Act and the Constitution are actionable under the Civil Rights Act, 42 U.S.C. § 1983. Transport also alleges that the restraints, coupled with the operation and effect of various agreements between, and combination of, the Port Authority and co-defendant, Long Island Airport Limousine Service, Inc. (and its president Walter Stuart) unreasonably affects commerce in the relevant geographic and service markets and violates Section One and Two of the Sherman Act.

(Plaintiff's Brief in Opposition to the Motions at p. 17). These claims are discussed separately below.

## I. *The Commerce Clause*

Count I of the complaint alleges that the fee of 8% of gross receipts as charged by the Port Authority for the use of counter space and telephones is "irrational, arbitrary, unreasonable and bears no rational relationship to the presence of the [telephone facilities and counter space] at the airports, is not fixed in accordance with a uniform, fair or practical standard, is excessive in relation to the benefit conferred by the Port Authority, and constitutes an unreasonable burden on interstate commerce." (Complaint ¶ Eighteenth). Transport states that approximately 65% of its revenues are derived from customers who utilize the telephone services and that if such service is denied them, Transport could become insolvent to the detriment of the public. (Complaint ¶ Seventeenth). This count is asserted only against the Port Authority.

█ The United States Supreme Court has held that when a state or local government enters the market as a participant it is not subject to the restraints of the Commerce Clause. *Reeves, Inc. v. Stake,* 447 U.S. 429, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980); *Hughes v. Alexandria Scrap Corp.,* 426 U.S. 794, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976). In *Reeves, supra,* the Court stated:

> The basic distinction drawn in *Alexandria Scrap* between States as market participants and States as market regulators make good sense and sound law. As that case explains, the Commerce Clause responds principally to state taxes and regulatory measures impeding free private trade in the national market place.... There is no indication of a constitutional plan to limit the ability of the States themselves to operate freely in the free market.

447 U.S. at 436–37, 100 S.Ct. at 2277. (citations omitted).

█ Under the analysis of *Reeves* and *Alexandria Scrap,* it is necessary for us to determine whether the Port Authority, in dealing with concessionaires at the airport, is (a) a state agency exercising the role of a regulator and therefore subject to the limitations of the Commerce Clause or (b) a market participant and therefore immune to such limitations. We find that the Port Authority is a participant in the market for ground transport services in that it makes certain facilities available at a fee to transport companies. The Court in *Reeves* noted that the line between "market participant" and "market regulator" is not always bright. 447 U.S. at 440, 100 S.Ct. at 2279. Similarly, Justice Blackmun's concurring opinion in *White v. Massachusetts Council of Construction Employees, Inc., et al.,* —— U.S. ——, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983) underscores the difficulty in classifying a state's activity when it is not recognizable as a traditional state function. Justice Blackmun suggests that:

> The legitimacy of a claim to the market participant exemption thus should turn primarily on whether a particular state action more closely resembles an attempt to impede trade among private parties, or an attempt, analogous to the accustomed right of merchants in the private sector, to govern the State's own economic conduct and to determine the parties with whom it will deal.

—— U.S. at ——, 103 S.Ct. at 1050 (Blackmun, J., concurring). Following this approach, we conclude that the Port Authority's activities in determining to whom it will provide permittee services more closely resembles the activities of a merchant in the private sector. It is clear that DOT, and not the Port Authority, is the market regulator in the present context of the door-to-door ground transportation market. Thus, we conclude that the fee charged by the Port Authority is not subject to challenge under the Commerce Clause.

Further, we find that the matter before us comes within the rule recently set forth by the United States Supreme Court in *White v. Massachusetts Council of Construction Employers, supra,* as follows:

> The Commerce Clause is a grant of authority to Congress, and not a restriction

on the authority of that body. See *American Power & Light Co. v. SEC,* 329 U.S. 90 [67 S.Ct. 133, 91 L.Ed. 103] (1946); *Gibbons v. Ogden,* 9 Wheat. 1 [6 L.Ed. 23] (1824). Congress, unlike a state legislature authorizing similar expenditures, is not limited by any negative implications of the Commerce Clause in the exercise of its spending power. Where state or local government action is specifically authorized by Congress, it is not subject to the Commerce Clause even if it interferes with interstate commerce. *Southern Pacific Co. v. Arizona,* 325 U.S. 761, 769 [65 S.Ct. 1515, 1520, 89 L.Ed. 1915] (1945). Thus, if the restrictions imposed by the city on construction projects financed in part by federal funds are directed by Congress then no dormant Commerce Clause issue is presented.

—— U.S. at ——, 103 S.Ct. at 1047. Transport states that "a Joint Resolution of Congress was required with respect to the approval of the joint compact between New York and New Jersey to establish the Port Authority because, by its very existence as a 'bi-state agency,' almost everything that the Port Authority engages in has a profound effect on interstate commerce." Plaintiff's Memorandum of Points and Authorities in Opposition to Defendants' Motion for Summary Judgment at p. 44–45. Elsewhere in its brief, Transport tells us that "The Port Authority has received well over $200,000,000 in federal grants for the development of [Kennedy], LaGuardia and Newark Airports in accordance with the provisions of the Airport and Airway Development Act (49 U.S.C. § 1701 *et seq.*)." *Id.* at p. 61.

We need not examine here the extent to which federal funds have been applied by the Port Authority to the construction, maintenance, etc. of facilities provided to permittees. It is sufficient to find that the state action here has been specifically au-

thorized by Congress and is therefore immune under *White,* —— U.S. at ——, 103 S.Ct. at 1048. Accordingly, Count I is dismissed.

As an alternative basis for our dismissal of Count I, we find that the challenged fee does not constitute a burden on interstate commerce. In *Evansville-Vanderburgh Airport Authority District v. Delta Airlines, Inc.,* 405 U.S. 707, 92 S.Ct. 1349, 31 L.Ed.2d 620 (1972) the Supreme Court sustained the right of an airport, operated by a state agency, to charge "a reasonable fee to help defray the costs of construction and maintenance. . . ." *Id.* at 405 U.S. at 714, 92 S.Ct. at 1354.[5] In rejecting the claim that a charge based on the number of passengers enplaning burdens interstate commerce, the Court said:

> [T]he principle that burdens on the right to travel are constitutional only if shown to be necessary to promote a compelling state interest has no application in this context. See *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). The facility provided at public expense aids rather than hinders the right to travel.

405 U.S. at 714, 92 S.Ct. at 1354.

The Court, quoted *Hendrick v. Maryland,* 235 U.S. 610, 624, 35 S.Ct. 140, 142, 59 L.Ed. 385 (1915)[6] as follows:

> [W]here a state at its own expense furnishes special facilities for the use of those engaged in commerce, interstate as well as domestic, it may exact compensation therefor. The amount of the charges and the method of collection are primarily for determination of the state itself; and *so long as they are reasonable and are fixed according to some fair and practical standard,* they constitute no burden on interstate commerce. (citations omitted). *The action of the state must be treated as correct unless the contrary is made to appear.* In the instant case

---

**5.** In *Evansville-Vanderburgh, supra,* the Court held that a charge by a state or municipality of $1 per commercial passenger to help defray the costs of airport construction and maintenance does not violate the Commerce Clause or the federally protected right to travel.

**6.** *Hendrick* held that a state statute imposing a fee on drivers of motor vehicles to help defray the cost of road construction and repair did not violate the Commerce Clause.

there is no evidence concerning the value of the facilities supplied by the state, the cost of maintaining them, or the fairness of the methods adopted for collecting the charges imposed; and we cannot say from the mere inspection of the statute that its provisions are arbitrary or unreasonable. (underscoring supplied).

[S]o long as the toll is based on some fair approximation of use or privilege . . . and is neither discriminatory against interstate commerce nor excessive in comparison with the governmental benefit conferred, it will pass constitutional muster, even though some other formula might reflect more exactly the relative use of the state facilities by individual users.

405 U.S. at 712–13, 92 S.Ct. at 1355.

A fee of 10% of the gross revenues was charged to all ground transportation concessionaires by the City of New York when it operated Kennedy and LaGuardia Airports. The 10% fee was in effect at the time the Port Authority commenced operation in 1948 and continued in effect until 1978 when it was reduced to 8% by the Port Authority. The customary and general fee of 10% for these services at airports throughout the nation, as of 1969, was confirmed in *Toye Brothers Yellow Cab Co. v. Irby,* 437 F.2d 806, 811 (5th Cir.1971). In that case, the court said:

> No one contests that the Board is entitled to a reasonable fee for the use of the facilities provided at the Airport. The issue is to determine what is a reasonable fee, and how that may be computed. . . . The district court heard evidence tending to establish the fact that 10% of the gross receipts is a commonly accepted charge through the nation for use of Airport facilities.

437 F.2d at 811.

"The action of the State must be treated as correct unless the contrary is made to appear." *Hendrick v. Maryland, supra,* 405 U.S. at 713, 92 S.Ct. at 1353. We conclude that the 8% fee has not been shown to be unreasonable and a burden on interstate commerce. Indeed, we find that the fee is not excessive in comparison with the nationwide value placed on the benefit conferred.

Applying the standard set forth in *Evansville-Vanderburgh, supra,* ("some fair approximation of use or privilege [and not] excessive in comparison with the governmental benefit conferred") we reject Transport's assertion that reasonableness of the fee is to be determined with respect to its ability to pay. We agree with the statement of the district court in *Toye Brothers Yellow Cab Co. v. Irby,* 305 F.Supp. 911 (E.D.La.1969), *aff'd,* 437 F.2d 806 (5th Cir. 1971):

> Whether Coast makes a profit or not has no bearing on the reasonableness of the percentage charge in question. The charge is not a cost of doing business and if Coast cannot afford these costs if they are reasonable, then it must adjust and not the Board.

305 F.Supp. at 914.

■ Similarly, we reject Transport's claim that it receives no benefit from the facilities provided but that the benefit is enjoyed by the public. Transport also argues that the fee charged is unreasonable because it is unrelated to the cost to the Port Authority for construction and maintenance of the facilities provided. We reject this cost-benefit analysis as requiring an improper inquiry into the internal affairs of a state agency; it is not for the court to substitute its judgment for the specialized experience and expertise of the Port Authority. *Port of New York Authority v. Eastern Airlines, Inc.,* 259 F.Supp. 745 (E.D. N.Y.1966).

## II. *Equal Protection and Due Process*

■ As Count II against the Port Authority, Transport states, in relevant part, as follows:

> The Port Authority's classification of Transport as a ground transportation entity required to pay the foregoing eight (8%) percent of gross receipts "fee", is an arbitrary, irrational and unreasonable classification, is not rationally related to a legitimate government interest, is an invidious discrimination, is confiscatory in

nature, and violates the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the United States Constitution.

(Complaint, ¶ Twenty-Fifth).

Count IX, added by amendment, raises claims under the New York State Constitution which are similar to those set forth at Count II. These state claims respecting equal protection and due process rights are discussed together with the federal constitutional claims.

Briefly stated, Transport alleges that because other transport services (such as buses, taxi cabs, etc.), have access to the airports without fee, the fee charged Transport violates the Equal Protection and Due Process Clauses of the Fourteenth Amendment.

These claims are frivolous. The rationale of the classification is obvious: those transport companies that avail themselves of the service and pay the charge, receive the benefits of the service. All such companies are charged the same fee. Those who do not use the service are not charged. The Court in *City of New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2516–17, 49 L.Ed.2d 511 (1976) held:

Unless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, our decisions presume the constitutionality of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate state interest ... [R]ational distinctions may be made with substantially less than mathematical exactitude.

The rule set forth in *City of New Orleans v. Dukes, supra,* compels our dismissal of these constitutional claims on the grounds that the challenged classification satisfies the "rationally related" test. We note that *Morey v. Doud,* 354 U.S. 457, 77 S.Ct. 1344, 1 L.Ed.2d 1485 (1957), which was "the only case in the last 50 years to invalidate an economic regulation on equal protection grounds ... was expressly overruled by *City of New Orleans v. Dukes, supra,* 407

U.S. at 306, 96 S.Ct. at 2513." *United States v. Consolidated Edison Co.,* 580 F.2d 1122, 1131, n. 15 (2d Cir.1978). *See also, Dandridge v. Williams,* 397 U.S. 471, 487, 90 S.Ct. 1153, 1162, 25 L.Ed.2d 491 *rehearing denied* (1970).

Additionally, we find that Transport has failed to identify any due process violation here under the United States Constitution or the New York State Constitution. Count II and Count IX are dismissed.

### III. *Airport and Airways Development Act*

■ Count III, brought only against the Port Authority states, in relevant part, as follows:

[T]he Port Authority has applied for and accepted airport and development projects under the Airport and Airways Development Act of 1970, as amended, 49 U.S.C. § 1701 *et seq.* and has expressly contracted with the Federal Aviation Administration to comply with such Act which included the following requirement: "The airport to which the project for airport development relates will be available for public use on fair and reasonable terms and without unjust discrimination...." (49 U.S.C. § 1718).

By requiring Transport to execute a privilege permit and/or pay eight (8%) percent of its gross receipts to the Port Authority, or be excluded by JFK and LaGuardia Airports, or be prohibited from utilizing its telephone facilities, the Port Authority has violated and continues to violate the foregoing federal statute and to satisfy its obligations thereunder in that the proposed privilege permit and the fees thereunder are unfair, unreasonable and unjustly discriminate against Transport.

Complaint, ¶¶ 28, 29.

Transport seeks a declaratory judgment stating that the challenged fee is discriminatory and unlawful.

Defendants correctly contend that the statute cited by plaintiff was intended to establish the rights of air carriers and

fixed-based operators at airports and does not provide a right of action to ground transport companies, such as Transport. *See* Federal Aviation Administration Circulars AC 150/5196 effective August 18, 1966, AC–150–5190–2A effective April 4, 1972.

Transport concedes that it has no cause of action under the Airport and Airway Development Act of 1970. Count III is dismissed.

## IV. *Return of Payments Made by Transport*

■ As Count IV, brought only against the Port Authority, Transport claims that the Port Authority unlawfully extracted payments "in excess of $16,000" from Transport with respect to the "privilege permit." *See* Complaint, ¶¶ Thirty-First to Thirty-Fifth. Transport seeks payment of this sum plus interest from the Port Authority and a declaratory judgment stating that no fees are, or were, due from Transport respecting such permit.

This claim, for money had and received, is inadequately supported by the related claims which are dismissed herein. Count IV is dismissed.

## V. *Anti-Trust Claims*

Transport brings three anti-trust claims. Count V is brought against all defendants under Section 1 of the Sherman Act, 15 U.S.C. § 1.[7] Count VII is brought against L.I. Limousine and Stuart under Section 2 of the Sherman Act, 15 U.S.C. § 2.[8] Count VIII, added by amendment, is brought against the Port Authority under Section 2 of the Sherman Act, 15 U.S.C. § 2.

Transport seeks damages for injury to its business in the amount of $5,500,000 to be trebled to $16,500,000 pursuant to 15 U.S.C. § 15. We treat the three counts together here.

Briefly stated, Transport claims that the 8% charge "has an unreasonable anti-competitive effect from two standpoints: (1) It enhances L.I. Limousine's monopoly control over the line-run ground transportation (bus line) market on Long Island, while, at the same time, (2) permits L.I. Limousine to exploit its bus line monopoly to obtain a competitive advantage in its contract carriage or door-to-door operations. (Schoolman Aff., ¶¶ 8, 9; Dunbar Aff. ¶¶ 47–61). Transport also argues that because the Port Authority and L.I. Limousine are monopolies, the combination between the two also violates Section 2 of the Sherman Act." (Plaintiff's memo p. 29).

Dunbar, Transport's economist, contends that the Port Authority abuses the monopoly power it has over the transportation market, particularly "the door-to-door limousine market" (Dunbar Aff. p. 4) in that it loses money on its transportation services, i.e., "bus, bus terminal and rail programs." (Dunbar Aff. p. 6) and that the loss is underwritten from its other activities. Further, while conceding that a significant benefit is conferred as consideration for the 8% gross receipts charge (See Dunbar Aff. pp. 16–20), Dunbar claims that such charge is used to subsidize other operations of the airport; that the door-to-door limousine service, (such as Transport offers), pays a

---

**7.** 15 U.S.C. § 1 provides, in relevant part:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal.... Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

**8.** 15 U.S.C. § 2 provides:

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

disproportionate share of the cost; that the charge has an adverse effect on competition in the door-to-door service business. Dunbar also contests the amount of the fee charged, suggesting that the fee should be based upon the cost of constructing the counter space and telephone facilities and the cost of maintaining them.

Dunbar explains the adverse effect on the door-to-door transport market as follows: L.I. Limousine, with its monopoly position in line-run transportation, is better able to charge the 8% fee to its overhead, thus L.I. Limousine's door-to-door service is priced below Transport's service,[9] and *IF* L.I. Limousine engages in predatory pricing, in the "short run" (Dunbar Aff. p. 67) it will drive Transport out of the market and prevent others from entering the door-to-door transport service business.

Dunbar merely hypothesizes that L.I. Limousine shifts the burden of the gross receipts fee to its line run business, leaving it free to engage in predatory pricing in its door-to-door service. He concedes that he has "not studied in depth whether [L.I. Limousine] has engaged in "predatory pricing." In examining Transport's affidavits submitted in opposition to the motion, we find that Transport offers theories of possibilities of anti-competitive effect based on assumptions unsupported by evidence. The affidavits do not offer any evidence to show that L.I. Limousine would probably succeed in monopolizing door-to-door limousine service to and from the airports (assuming that door-to-door service is the relevant market) so as to "foreclose competitors from a substantial market." *Standard Oil Co. and Standard Stations v. United States,* 337 U.S. 293, 304, 69 S.Ct. 1051, 1057, 93 L.Ed. 1371 (1949). The competition in the

door-to-door limousine service appears to be keen. Other door-to-door services competitors for business at Kennedy and LaGuardia who have counter and telephone service and pay the 8% charge are Carey, Resort, Metropolitan, Connecticut Limo, Short-Line, V.I.P. and Fugazy (Tr. Feb. 1983, pp. 16–17). The conclusory claim, that L.I. Limousine shifts the burden of the 8% fee to the line-run service, is without any evidentiary foundation; the argument based on this assumption is unpersuasive. Transport has failed to offer any evidence showing that L.I. Limousine shared in the Port Authority's power to monopolize the ground transport industry to and from the airports or the intent of L.I. Limousine to monopolize the relevant market. *Costello Pub. Co. v. Rotelle,* 670 F.2d 1035, 1046 (D.C.Cir. 1981); *Forro Precision, Inc. v. International Business Machines Corp.,* 673 F.2d 1045, 1059 (9th Cir.1982). Indeed, Transport does not clearly define "the relevant market in which the defendant's actions are to be appraised." *Mullis v. Arco Petroleum Corp.,* 502 F.2d 290, 295 (7th Cir.1974).[10]

■ Count V, charging a violation of Section 1 of the Sherman Act, suffers from an additional defect. Transport fails to offer any evidence of an agreement or conspiracy in restraint of trade. Section 1 does not prohibit independent business actions and decisions. A finding of an anti-competitive agreement, express or otherwise between two or more persons is fundamental to any Section 1 claim. *Modern Home Institute, Inc. v. Hartford Accident and Indemnity Co.,* 513 F.2d 102, 108–09 (2d Cir. 1975). *See Oreck Corp. v. Whirlpool Corp.,* 639 F.2d 75, 78 (2d Cir.1980), *cert. denied,* 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 618 (1981), *Greyhound Rent-A-Car, Inc. v. City*

**9.** The Schoolman affidavit complains that Long Island Limousine rates for door-to-door service are $2.00 to $3.00 less than Transport's and concludes that this is the result of the leverage that Long Island Limousine has from its monopoly in the line-run service. He bases this conclusion on the Dunbar affidavit.

**10.** Dunbar's indecisiveness in defining the relevant market is demonstrated in paragraph 6 as follows:

The markets addressed in this study involve ground access to and from Kennedy International and LaGuardia. More specifically, I concentrate on trips between Nassau/Suffolk counties (in Long Island) and the airports. This is the market which Transport operates, providing door-to-door limousine service. In addition, there are a number of other commercial vendors ranging from taxicab to limousine to bus service.

*of Pensacola,* 676 F.2d 1380, 1383 (11th Cir. 1982), *app. for cert. pndg.* L.I. Limousine's contract with the Port Authority to pay the 8% fee does not satisfy this requirement. Additionally, with respect to claims brought under Section 2 of the Sherman Act, "[o]ne who alleges that he is a victim of an anti-trust conspiracy and seeks to impose the heavy sanctions of the Sherman Act upon the accused must show more than the existence of a climate in which such a conspiracy may have been formed." *Venture Technology, Inc. v. National Fuel Gas Co.,* 685 F.2d 41, 47 (2d Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 362, 74 L.Ed.2d 398 (1982).

▆ Even if Transport's claims were adequately supported, we find that with respect to the challenged fee and service arrangement here, the activities of the Port Authority and the private defendants are beyond the reach of the anti-trust laws. We apply the test set forth in *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978), which narrowed, with respect to municipalities, the broader "state-action exemption" established by the Supreme Court in *Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977); *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1974); *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943).

In *City of Lafayette, supra,* the Court's plurality opinion held that mere status as a governmental entity is insufficient for exemption from the anti-trust laws. The Court held:

> [T]he *Parker* doctrine exempts only anti-competitive conduct *engaged in as an act of government by the state as sovereign, or by its subdivisions, pursuant to state policy to displace competition with regulation or monopoly public service.*

Without determining here whether the Port Authority's activities constitute any of the numerous and various anti-competitive activities alleged by Transport, we find that the alleged culpable conduct would, nonetheless, be exempt from the anti-trust laws. The Port Authority is an agent of the state, specifically created by the state and endowed with monopoly power to enforce state policy regarding, *inter alia,* the metropolitan airports. With respect to the 8% fee charged to permittees, the New York legislature has specifically directed the Port Authority to charge fees to achieve and maintain a self-sustaining status. We find that the conduct of charging such fee is clearly within the narrowed state-action exemption of *City of Lafayette, supra.*

▆ With respect to the provision of services, we note that Transport does not object to the provision of counter and telephone[11] facilities but rather, (1) to the charge and (2) to the provision of such services to a rival door-to-door ground transport company which has also received DOT approval for its designated stop bus line.

With respect to the provision of services to any permittee, including Transport and L.I. Limousine, the Port Authority merely "acts pursuant to state policy," as effected by DOT, in requiring the permit applicant to receive the DOT grant of contract carriage authority as a precondition to award of the permit. Transport's allegations of anti-competitive conduct are largely based upon L.I. Limousine's market position and revenues with respect to its bus line serving designated stops. We find that the grant by DOT of that monopoly position constitutes state policy to "displace competition with . . . monopoly services" in the ground transport bus line market. We conclude that the Port Authority's provision of counter and telephone services to L.I. Limousine, for its door-to-door transport operations, at the same fee as charged to all door-to-door transport permittees, does not fall outside of the exemption provided in *City of Lafayette, supra,* merely because L.I. Limousine is also the DOT approved

---

11. The complaint refers only to telephone facilities. The court assumes that where it refers to telephone facilities, it includes counter space.

Our conclusions here are not altered if Transport uses phone, but not counter, facilities.

bus line. Indeed, we find that because the state has created L.I. Limousine's market position regarding designated stop transport, we are compelled to reject any challenge under the anti-trust laws respecting the anti-competitive effect of giving L.I. Limousine counter and phone facilities for its door-to-door operations.

It is important to note here that Transport's application to DOT for designated stop transport authority was denied by the DOT. State policy, not the acts of the defendants, is the basis for the alleged market advantage held by L.I. Limousine.

■ We do not find that the characterization of the Port Authority as a state agency enforcing state regulation of the ground transport industry, with respect to its claim of immunity from the proscriptions of the anti-trust laws is inconsistent with the characterization of the Port Authority as a participant in the market in dealing with concessionaires. The policy reasons supporting restrictions on anti-competitive action differ from those which support action under the commerce clause.

■ L.I. Limousine and Stuart, as private parties, have acted here under direct state regulation. We find that where L.I. Limousine "has done nothing more than obey the command of his state sovereign ... [w]here "the State is already regulating an area of the economy" *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 592, 96 S.Ct. 3110, 3118, 49 L.Ed.2d 1141 (1976), the exemption extends to the private party. *See E.W. Wiggins Airways, Inc. v. Massachusetts Port Authority,* 362 F.2d 52, 55–56

(1st Cir.1966), *cert. denied,* 385 U.S. 947, 87 S.Ct. 320, 17 L.Ed.2d 226 (1966).

We dismiss Counts V, VII and VIII as to all defendants.

## VI. *Unfair Competition*

■ Count VI, brought against Long Island Limousine and its president, Walter Stuart, is a pendent state claim alleging unfair competition. Following dismissal of the federal claims herein, we are without jurisdiction to hear this state claim. *Aldinger v. Howard,* 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976); *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). Count VI is dismissed without prejudice.

## VII. *Civil Rights Action*

■ The only remaining federal claim, a civil rights action pursuant to 42 U.S.C. § 1983, is not stated as a separate count. Transport alleges violation of constitution rights in the preliminary paragraphs of the complaint and in the demand for punitive damages. We dismiss this claim on the grounds that (1) no finding of constitutional violation (respecting the Commerce Clause, the Equal Protection clause and the Due Process clause) or federal statutory violation (respecting the anti-trust laws and AADA) can be made here and (2) Transport's remaining claim that its constitutional property rights were violated is vague and without support.[12] Transport has failed to identify any liberty or property right of which it was deprived.

12. Transport states at p. 58 of Plaintiff's Memorandum of Points and Authorities in Opposition to Defendants' Motion for Summary Judgment:

Property rights of Transport are properly redressable under § 1983 and, despite Port Authority's assertions, substantive due process is still constitutionally required when government acts.

Plaintiff supports this statement of current law with a case decided in 1897 and several more recent cases where the alleged property right and the alleged violation of such right were clearly identified. Unlike those cases, plaintiff here merely characterizes the challenged fee as confiscatory. (*Id.*) *C.f. Lynch v. Household Finance Corporation,* 405 U.S. [538] 540, 92 S.Ct. 1113 [31 L.Ed.2d 424] (1972) (defendant creditor garnished plaintiff's checking account under state law provision permitting garnishment without notice or opportunity to be heard, a procedural due process violation). *Dieffenbach, Jr. v. Attorney General of Vermont,* 604 F.2d 187 (2d Cir.1979) (mortgagor challenged state "strict foreclosure" laws which permitted mortgagee to retain entire proceeds of subsequent sale of foreclosed real property without application of proceeds to satisfaction of the mortgage debt).

*Summary*

Defendants' motions to dismiss the complaint are granted.[13] All the claims are dismissed with prejudice except Count VI. Count VI is dismissed without prejudice, and it is

SO ORDERED.

The Clerk of the Court is directed to enter judgment in favor of defendants and against the plaintiff dismissing the complaint.

13. The Report and Recommendation of Magistrate Jordan is affirmed in part (dismissal of Counts III and V and claims under 42 U.S.C. § 1983), and reversed in part (Counts I, II, IV, VI, VII, VIII and IX were sustained by the Magistrate).